No. 13-11305

In the United States Court of Appeals for the
Fifth Circuit

RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR
THE STANFORD INTERNATIONAL BANK, LTD., ET AL; OFFICIAL STANFORD
INVESTORS COMMITTEE,

*Plaintiffs-Appellants*

v.

THE GOLF CHANNEL, INCORPORATED; TGC, L.L.C., DOING BUSINESS
AS GOLF CHANNEL,

*Defendants-Appellees*

FROM THE UNITED STATES DISTRICT COURT, UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
CIVIL ACTION NO. 3:11-CV-294
HONORABLE DAVID C. GODBEY, PRESIDING

BRIEF OF APPELLEE
TGC, LLC D/B/A GOLF CHANNEL

FULBRIGHT & JAWORSKI LLP
Theodore W. Daniel, State Bar No. 05362400
ted.daniel@nortonrosefulbright.com
Oscar Rey Rodriguez, State Bar No. 00791557
rey.rodriguez@nortonrosefulbright.com
Kyle M. Schindler, State Bar No. 24066033
kyle.schindler@nortonrosefulbright.com
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone:  (214) 855-8000
Telecopier:  (214) 855-8200

*Counsel for Appellee, TGC, LLC d/b/a GOLF CHANNEL*

**Oral Argument Requested**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..........................................................................i

TABLE OF AUTHORITIES ............................................................. iii

CERTIFICATE OF INTERESTED PERSONS ......................................vi

COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW .........1

STATEMENT OF THE CASE.................................................................3

    I.     Procedural History...............................................................3

    II.    Golf Channel ......................................................................5

    III.   Golf Channel's Media Sponsorship Contract With Stanford ..............7

          A.     Golf Channel Negotiated an Arm's Length Contract With Stanford to Sell Media Sponsorships.......................................7

          B.     Under the Contract, Golf Channel Sold Stanford Media Sponsorships at Market Rates for 2007-2008............................9

          C.     The Generic Content of the Media Sponsorships....................10

          D.     Golf Channel Provided No Marketing or Advertising Advice to Stanford ...................................................................11

          E.     Golf Channel Performed Its Obligations Under the Contract and Is Itself a Creditor of Stanford............................11

    IV.   Neither Golf Channel Nor Stanford's Marketing Officer Who Negotiated the Contract Had Any Knowledge of Stanford's Ponzi  Scheme ...........................................................................12

    V.    Appellants' Allegations.......................................................13

          A.     The Complaint.........................................................................13

          B.     Deposition Testimony of the Receiver and the Committee Chairman .................................................................................14

          C.     Summary Judgment Arguments and Allegations Raised for the First Time on Appeal....................................................16

SUMMARY OF THE ARGUMENT ........................................................18

    I.     It Is Undisputed That Golf Channel Received the Transfers in Good Faith and for Reasonably Equivalent Value as Defined by UFTA...................................................................................18

II.    The District Court Did Not Err in Holding That Golf Channel's Sale of Media Sponsorships Conferred Value as a Matter of Law ...................................................................................... 18

III.    There Is Zero Evidence in the Record That Golf Channel Provided "Services Directed at Expanding a Ponzi Scheme" ............ 20

ARGUMENT .......................................................................................... 20

I.    Legal Standards .................................................................... 20

    A.    UFTA ......................................................................... 20

    B.    Choice of Law .......................................................... 23

II.    The District Court Correctly Held That Golf Channel Received the Transfers in Good Faith and Exchanged Reasonably Equivalent Value as Defined by UFTA ............................................. 25

III.    The District Court Correctly Held That Golf Channel's Sale of Media Sponsorships Conferred Value as a Matter of Law ............... 27

    A.    Appellants' Argument for a Categorical Ponzi Scheme Exception ................................................................. 27

    B.    Appellants' Authority Does Not Support Application of a Categorical Public Policy Ponzi Scheme Exception for Innocent Trade Creditors and Vendors ................................... 28

    C.    There Is No Authority That Justifies Avoidance of Transfers to Arm's Length Vendors and Trade Creditors ....... 31

    D.    The District Court Properly Considered Value From the Perspective of the Creditors and Consistent With the Policy Concerns of UFTA ......................................... 32

IV.    There Is Zero Evidence in the Record That Golf Channel Provided "Services Directed at Expanding a Ponzi Scheme" ............ 36

    A.    The District Court Correctly Held That Golf Channel Was a Trade Creditor ................................................. 36

    B.    There Is No Evidence That Golf Channel's Performance Under the Contract Furthered the Stanford Ponzi Scheme ...... 38

CONCLUSION ...................................................................................... 40

CERTIFICATE OF SERVICE ............................................................. 42

CERTIFICATE OF COMPLIANCE ..................................................... 42

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*In re AFI Holding, Inc.,*
   525 F.3d 700 (9th Cir. 2008) ...............................................................................33

*BFP v. Resolution Trust Corp.,*
   511 U.S. 531 (1994)...............................................................................................22

*Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.),*
   6 F.3d 1119 (5th Cir. 1993) ..................................................................................34

*Columbia Med. Ctr. Of Las Colinas v. Hogue,*
   271 S.W.3d 238 (Tex. 2008) ................................................................................23

*Corpus v. Arriaga,*
   294 S.W.3d 629 (Tex. App—Houston [1st Dist.] 2009, no pet.)......................22

*Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.),*
   275 B.R. 641 (Bankr. M.D. Fla. 2002).........................................................31, 32

*Dicello v. Jenkins (In re Int'l Loan Network, Inc.),*
   160 B.R. 1 (Bankr. D.D.C. 1993) .......................................................................29

*Donnel v. Kowell,*
   533 F.3d 762 (9th Cir. 2008) ...............................................................................33

*Heart of Adoptions, Inc. v. J.A.,*
   963 So.2d 189 (Fla. 2007) ...................................................................................22

*In re Hedged-Inv. Assocs., Inc.,*
   84 F.3d 1286 (10th Cir. 1996) .............................................................................33

*In re Hinsley,*
   201 F.3d 638 (5th Cir. 2000) ...............................................................................30

*Holly v. Auld,*
   450 So.2d 217 (Fla. 1984) ...................................................................................22

*Janvey v. Alguire*,
    Case No. 3:10-cv-00931-N-BL, 2013 WL 2451738 (N.D. Tex. Jan.
    22, 2013) .................................................................................................33

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
    712 F.3d 185 (5th Cir. 2013) ................................................................30

*Mendenhall v. State*,
    48 So.3d 740 (Fla. 2010) ......................................................................23

*Mitutoyo Am. Corp. v. Suncoast Precision, Inc.*,
    Case No. 8:08-mc-36-T-TBM, 2011 WL 2802938 (M.D. Fla. July
    18, 2011) .................................................................................................21

*Mladenka v. Mladenka*,
    130 S.W.3d 397 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ...................21

*Nat'l Liab. & Fire Ins. Co. v. Allen*,
    15 S.W.3d 525 (Tex. 2000).....................................................................22

*Price v. Digital Equip. Corp.*,
    846 F.2d 1026 (5th Cir. 1988) ...............................................................26

*In re Ramirez Rodriguez*,
    209 B.R. 424 (Bankr. S.D. Tex. 1997) ..................................................29

*Randy v. Edison Worldwide Capital (In re Randy)*,
    189 B.R. 425 (Bankr. N.D. Ill. 1995) ..............................................29, 31

*S.E.C. v. Harris*,
    C.A. No. 3:09-CV-1809-B, 2010 WL 3719318 (N.D. Tex. Sept. 7,
    2010) (Stickney, J.)...............................................................................30

*S.E.C. v. Resource Dev. Intern., LLC*,
    487 F.3d 295 (5th Cir. 2007) .................................................................30

*Samson v. U.S. West Commc'ns, Inc. (In re Grigonis)*,
    208 B.R. 950 (Bankr. D. Mont. 1997)...................................................35

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ..............................................................30, 33

*St. Luke's Episcopal Hosp. v. Agbor*,
   952 S.W.2d 503 (Tex. 1997) ................................................................22

*In re Texas Mortgage Servs., Inc.*,
   761 F.2d 1068 (5th Cir. 1985) .........................................................26

*In re Tower Environmental, Inc.*,
   260 B.R. 213 (Bankr. M.D. Fla. 1998) ............................................21

*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) ......................................24, 27, 28, 29

*Yohey v. Collins*,
   985 F.2d 222 (5th Cir. 1993) ...........................................................26

**Rules and Statutes**

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ §§ 24.001 *et seq.* ...........................................20

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 24.004 ......................................2, 4, 21, 26

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 24.005 ..............................................20

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 24.009 ............................................20, 21

Fʟᴀ. Sᴛᴀᴛ. §§ 726.101, *et seq.*...................................................20

Fʟᴀ. Sᴛᴀᴛ. § 726.104 ..................................................................21

Fʟᴀ. Sᴛᴀᴛ. § 726.105 ..................................................................20

Fʟᴀ. Sᴛᴀᴛ. § 726.109 ..............................................................20, 21

**Other Authorities**

3 Roy S. Gieger, Bankruptcy Litigation § 17:83 (Westlaw 2013) .........................32

## CERTIFICATE OF INTERESTED PERSONS

The undersigned certifies that the parties listed below are the persons and entities interested in this appeal:

1.        Plaintiff-Appellant, Receiver
            Ralph S. Janvey

2.        Attorneys for Plaintiff-Appellant, Receiver Ralph S. Janvey
            Kevin M. Sadler
            Scott D. Powers
            David T. Arlington
            Stephanie F. Cagniart
            Baker Botts L.L.P.
            98 San Jacinto Blvd., Suite 1500
            Austin, Texas 78701

            Timothy S. Durst
            Baker Botts L.L.P.
            2001 Ross Avenue, Suite 600
            Dallas, Texas 75201

3.        Plaintiff-Appellant
            Official Stanford Investors' Committee

4.        Attorneys for Plaintiff-Appellant, Official Stanford Investors' Committee

            Nicholas A. Foley
            Douglas J. Buncher
            Negligan Foley L.L.P.
            325 N. St. Paul, Suite 3600
            Dallas, Texas 75201

            Peter D. Morgenstern
            Butzel Long PC
            380 Madison Avenue, 22nd Floor
            New York, NY 10017

Edward C. Snyder
Castillo Snyder, P.C.
300 Convent St., Suite 1020
San Antonio, Texas 78205

Edward F. Valdespino
Strasburger & Price L.L.P.
300 Convent St, Suite 1020
San Antonio, Texas 78205

5.       Defendant-Appellee TGC, LLC d/b/a Golf Channel

6.       Attorneys for Defendant-Appellee TGC, LLC d/b/a Golf Channel

Theodore W. Daniel
Oscar Rey Rodriguez
Kyle M. Schindler
Fulbright & Jaworski LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

## COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Appellee TGC, LLC d/b/a Golf Channel's ("Golf Channel") Motion for Summary Judgment and the District Court's November 5, 2013 Order (the "Order")[1] provide multiple reasons why the claims of Ralph S. Janvey, in his Capacity as Court-Appointed Receiver for The Stanford International Bank, Ltd., *et al.* ("Receiver") and the Official Stanford Investors Committee (the "Committee") (collectively, "Appellants") fail as a matter of law, any of which provide this Court with a proper basis to affirm the District Court's Order.  Golf Channel thus asserts the following counter issue and sub-issues to be presented in this appeal:

**ISSUE:  Whether the District Court's Order granting Golf Channel's Motion for Summary Judgment and denying Appellants' Motion for Summary Judgment is affirmable on any basis in the record or under applicable law.**

**Sub-Issue (1)  Whether the District Court was correct in holding that Golf Channel received the transfers at issue in good faith and in exchange for reasonably equivalent value as defined by the Uniform Fraudulent Transfer Act ("UFTA") because:**

> **(a) It is undisputed in the record that Golf Channel received the transfers in good faith without any knowledge of Stanford's insolvency or Ponzi scheme; and**

---

[1] The Order shall hereinafter refer to that Order granting Golf Channel's Motion for Summary Judgment and denying the Receiver's Motion for Summary Judgment, Case No. 3:11-cv-002940N-BL, Dkt. 93, located in this Court's Record at pages ROA.6492-6507.

      **(b) It is undisputed in the record that Golf Channel's transaction with Stanford was arm's length, at fair market value, in the ordinary course of business, and therefore was a "transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction."** TEX. BUS. COMM. CODE § 24.004(d).

**Sub-Issue (2)  Whether the District Court was correct in holding that Golf Channel's performance under its contract with Stanford conferred value as a matter of law, notwithstanding Appellants' assertion of a public policy exception for services provided to a Ponzi scheme because:**

      **(a)  If value is to be determined "from the standpoint of the creditors," Golf Channel itself is a trade creditor of Stanford no differently situated than defrauded investors who received a partial return of their principal investment;**

      **(b)  Value is to be determined at the time of the transfer, and the media sponsorships Golf Channel sold to Stanford had an independent, content-neutral value at the time of the transfers regardless of how Stanford ultimately utilized the purchased media sponsorships; and**

      **(c)  There is no statutory Ponzi scheme exception to the UFTA affirmative defense, nor is there any precedent in UFTA jurisprudence, including the authority relied upon by Appellants, to disgorge transfers received by innocent vendors or trade creditors in the ordinary course of business merely because they unknowingly conducted business with a Ponzi scheme.**

**Sub-Issue (3) Even if Appellants' public policy exception can apply to vendors or trade creditors, whether there is any evidence in the record that Golf Channel actually provided services in furtherance of Stanford's scheme.**

## STATEMENT OF THE CASE

### I.    Procedural History

On February 15, 2011, Appellants sued Golf Channel, asserting claims of fraudulent transfer and unjust enrichment, and seeking to disgorge all payments Golf Channel received in exchange for its sale of media sponsorships to one of the Stanford Financial entities ("Stanford")[2] in the regular course of Golf Channel's business. ROA.32-49. Appellants filed their First Amended Complaint on August 31, 2012. ROA.184-99.

Golf Channel and Appellants filed competing Motions for Summary Judgment. ROA.248-51, 369-72. After full briefing by the parties on both motions, the District Court granted Golf Channel's Motion for Summary Judgment, denied Appellants' competing Motion for Summary Judgment, and entered an Order and Final Judgment dismissing Appellants' claims with prejudice. ROA.6492-6508. In its Order, the District Court noted that it was undisputed that (1) Golf Channel received the transfers from Stanford in good faith and (2) Golf Channel sold the media sponsorships to Stanford at arm's length, for fair market

---

[2]  The contract at issue was executed by Stanford Foundation, Inc., but Golf Channel received payments from Stanford Financial Group Company ("SFGC") and Stanford Financial Group Global Management, LLC ("SFGGM"). After execution of the contract, Stanford Foundation, SFGC and SFGGM executed an amendment and assignment of the contract under which Stanford Financial Group Company became the original purchaser, and the contract was assigned to Stanford Financial Global Management, LLC. ROA.320, 334-335. As the District Court and this Court have both held in other contexts that all of the various Stanford entities operated as a single entity in most respects, Golf Channel will simply refer to "Stanford" as a single entity unless it is necessary to differentiate.

value, and in the ordinary course of business, and therefore "within the range of values for which the transferor would have sold the assets in an arm's length transaction." ROA.6496-97 (citing TEX. BUS. & COMM. CODE § 24.004(d)).

As Appellants conceded good faith and the reasonable equivalence of the exchange, the District Court focused its analysis on the crux of Appellants' all-or-nothing legal argument: whether Golf Channel's performance under the October 16, 2006 media sponsorship contract with Stanford ("Contract") could confer "value" as a matter of law under UFTA. ROA.6497-6507. The District Court held that Golf Channel's sale of media sponsorships did confer value at the time the transfers were made, as the right to air such sponsorships does have value. ROA.6497-6504. The District Court further held that even if a specific "Ponzi scheme public policy exception" exists as Appellants contend, that line of cases "does not preclude holding that the services provided by Golf Channel conferred value." ROA.6505-07. The District Court specifically emphasized in its value analysis that its ruling was consistent with public policy because one class of creditors (i.e., investment creditors) should not be favored over another equally innocent class of creditors (i.e., trade creditors like Golf Channel). ROA.6504.

In its value analysis, the District Court "assume[d] for the sake of discussion" that Stanford's advertisements on Golf Channel's network "indirectly resulted in the sale of additional fraudulent CDs," although it did not examine the

record or perform any analysis of this issue.  ROA.6494.  The District Court denied

as moot Golf Channel's Objection to the Supplemental Appendix Appellants filed

with their Reply in support of their Motion for Summary Judgment but noted its

disapproval of the filing of additional evidence in a reply brief.  ROA.6507.

## II.    Golf Channel

Golf Channel operates a cable television network that provides television

coverage of the game of golf, including, but not limited to, live and replayed

coverage of golf events, news programs, and golf-related instructional and reality

television shows.  ROA.300.  Golf Channel, which has existed since 1995, is the

only one of its kind in the world.  ROA.300.  Golf Channel has invested millions of

dollars to develop and maintain its television network and continues to spend

millions of dollars annually to operate the network.  ROA.300.  Like other cable

networks, Golf Channel earns revenue through two primary means:    (1)

distribution of cable network programming and (2) sale of air-time on its network

(i.e., media) to companies that want to advertise their business or enhance their

brand name by sponsoring various events on Golf Channel's scheduled

programming.  ROA.300, 327.  Media purchased for this purpose is generally

known in the television industry as a "media sponsorship," and media sponsorships

may include (1) commercials; (2) exposure within program time, including

sponsored features and placement of client "billboards" (i.e., logos) on desks or props, and (3) client branding in show titles.  ROA.300.

Media sponsorships available through Golf Channel have a market value. The price for these media sponsorships, i.e., the value of the purchased air-time, depends upon factors such as audience ratings, viewer demographics, and the finite number of commercials and other exposures available in Golf Channel's programming schedule.  ROA.301.  Commercial time is usually limited to ten minutes (in the form of 30 thirty-second commercials) per hour of programming. ROA.301.  Numerous corporations besides Stanford have invested substantial amounts of money to purchase media sponsorships on Golf Channel's network. ROA.301.  For example, during 2006-2008, corporations such as Barclay's, Northern Trust, and Transitions Optical purchased media sponsorships from Golf Channel.  ROA.301.

Golf Channel is not involved in the business of its customers that purchase media sponsorships, nor do Golf Channel's customers get involved with Golf Channel's business.  ROA.301.  Golf Channel does not typically assist its customers with the creation of their commercials, logos or other messages for purchased media sponsorships, or otherwise consult or advise its customers as to advertising strategy or content.  ROA.301.

**III.    Golf Channel's Media Sponsorship Contract With Stanford**

    **A.    Golf Channel Negotiated an Arm's Length Contract With Stanford to Sell Media Sponsorships**

On October 16, 2006, Golf Channel entered into the Contract with Stanford for media sponsorships for calendar years 2007 and 2008.  ROA.301, 306-08, 317, 323.  The Contract and subsequent extension of the Contract was the first and only relationship of any kind that Golf Channel had with Stanford.  ROA.302, 319.  Golf Channel has never had any ownership interest in any Stanford entity, and Stanford has never had any ownership interest in Golf Channel.  ROA.302.  Golf Channel had no ownership interest in IMG, Stanford's sports marketing consultant in connection with the Contract, and IMG had no ownership interest in Golf Channel at the time of the negotiation of the Contract or thereafter.  ROA.302.

Tom Knapp ("Knapp") negotiated the terms of the Contract on behalf of Golf Channel, and was subsequently responsible for Golf Channel's performance under the Contract.  ROA.301.  Knapp is Golf Channel's Senior VP for Programming and at the time of the negotiation held the position of Vice President for Strategic Partnerships at Golf Channel.  ROA.300.  At the time of the negotiations, Knapp had extensive prior experience negotiating media sponsorship contracts with corporations besides Stanford.  ROA.301.  Suzanne Hamm ("Hamm"), the Chief Marketing Officer for Stanford, and representatives from the

sports marketing consultant, IMG, represented Stanford during the negotiations. ROA.301-02, 318-20, 350-51. At the time of the negotiations of the Contract, IMG had represented other financial and non-financial clients in the negotiations of media sponsorship contracts with the Golf Channel. ROA.350-51.

Golf Channel and Stanford negotiated the Contract's terms over a period of several months. ROA.302, 318, 350-51. Golf Channel had its first meeting with Hamm and IMG in the summer of 2006, after Stanford announced its title sponsorship of a PGA Tour, Inc.'s ("PGA") tournament, the Stanford St. Jude Championship in Memphis, Tennessee ("St. Jude Championship"). ROA.302, 318-19. Golf Channel was not involved in Stanford's procurement of the title sponsorship of the St. Jude Championship, nor did it provide any advice or consulting related to Stanford's chosen advertising and sponsorship strategy. ROA.302-304, 318, 339-40. According to Hamm, media sponsorships offered by Golf Channel were attractive to Stanford because they could be used as an "activation strategy" to publicly communicate Stanford's prior investment in the title sponsorship of the St. Jude Championship. ROA. 321.

During the next several months in the summer and fall of 2006, Knapp negotiated the terms of a media sponsorship contract between Golf Channel and Stanford with Hamm and IMG. ROA.302, 317-18, 350-51. The Contract was memorialized and executed by letter agreement on October 16, 2006; Knapp

signed the Contract in Orlando, Florida on behalf of Golf Channel, and Hamm signed it on behalf of Stanford.  ROA.301-02, 317-18.

**B.    Under the Contract, Golf Channel Sold Stanford Media Sponsorships at Market Rates for 2007-2008**

The Contract is a standard media sponsorship agreement wherein Stanford purchased the right to run its commercials and sponsor various events on Golf Channel's network.    ROA.302, 306-08.    The media sponsorships Stanford purchased included:

- The presentment – "Golf Central Updates Presented by Stanford Financial Group" - of a minimum of 1400 Golf Central updates of golf tournaments all over the world.  In addition to the words "Golf Central Update presented by Stanford Financial," a billboard (i.e., logo) containing the word "Stanford" would appear on the screen.  ROA.302, 306, 310.

- The presentment - "Live from the Stanford St. Jude Championship" - of a minimum of 15 hours (live and re-air) of Golf Central and post-game programs live, on site from Golf Channel Broadcast Village or traditional "Live From" set during the week of the St. Jude Championship.  The "Live From" set showed the Stanford billboard. ROA.302, 307, 310.

- The "Live From" set for the Stanford St. Jude Championship also included integration of Stanford Financial messaging.  ROA.302, 307, 310.

- 176 presentments of a custom PGA TOUR feature on "Eagles for St. Jude" under which Stanford made a contribution to a charity for every "eagle" a player made during a PGA TOUR event.  ROA.302, 307, 310.

- The production by Golf Channel of a "Playing Lesson's from the Pro's" [sic] program featuring professional golfer Camilo Villegas, a Stanford

sponsored PGA TOUR player. Stanford never provided Mr. Villegas for the production of the lesson, so Golf Channel did not produce it. ROA.302, 307.

- A "Live From the US Open Billboard" sponsorship. ROA. 302, 307.

- 682 thirty-second commercials during golf tournaments and Sunday programming. Golf Channel was not able to locate these commercials. Stanford designed and created the commercials. ROA.302, 307.

The Contract was arm's length, Stanford did not overpay for the media sponsorships under the Contract, and Golf Channel sold the media sponsorships to Stanford at market rates. ROA.303, 319-20, 331, 350. Within that same time period, Golf Channel was able to sell similar media sponsorships to other corporations within the range of rates that Stanford paid. ROA.303.

## C.    The Generic Content of the Media Sponsorships

Stanford did not advertise or otherwise reference Certificates of Deposit ("CDs") or any other investment vehicle in any of the media sponsorships it purchased and aired on Golf Channel's network. ROA.302-03, 310, 323-24. The media spots reference Stanford, show the Stanford billboard (i.e., logo), or refer to Stanford's charitable contributions to the St. Jude Hospital under the "Eagles for St. Jude" program. ROA.302-03, 310. Suzanne Hamm, the Receiver, and the Chairman are not aware of any single investor, out of more than 21,000 investors, who purchased a CD because of a Stanford advertisement on Golf Channel's network. ROA.357, 366-67, 5474-75.

- 10 -

**D.      Golf Channel Provided No Marketing or Advertising Advice to Stanford**

Golf Channel did not advise Stanford on how to brand its name, nor did it provide any marketing or advertising services to Stanford.   ROA.303.   Golf Channel did not design, create, or participate in the design or creation of the commercials or messages that Stanford paid to run on Golf Channel's network. ROA.303.   Golf Channel did not design or participate in the design of the billboards (i.e., logos) that Stanford paid to show on Golf Channel's network. ROA.303, 324-25.  As with all of its advertising customers, Golf Channel did not get involved in the business of Stanford under or outside of the Contract. ROA.303.   Knapp was not aware that Stanford sold CDs and only generally understood from conversations with Hamm that Stanford was a wealth management company that provided financial planning to its customers. ROA.303.

**E.      Golf Channel Performed Its Obligations Under the Contract and Is Itself a Creditor of Stanford**

Golf Channel performed its obligations under the Contract, and Stanford never complained about Golf Channel's performance.  ROA.303, 326-27.  Golf Channel's performance under the Contract principally occurred at its studios in Orlando, Florida.  ROA.303.  Except its final monthly payment under the Contract,

Stanford paid Golf Channel all monies that it bargained for under the Contract. ROA. 303, 326-27.

During the same final month of the Contract in December 2008, Stanford renewed the Contract for an additional four (4) years ("Renewal Contract"). ROA.304, 312-13.  Golf Channel performed its obligations under the Renewal Contract, in January and early February 2009, but it did not get paid for such performance, and Stanford thereafter failed to perform under the Renewal Contract.  ROA.304.  Golf Channel filed claims through the Receiver's claims process for Stanford's failure to make its last monthly payment under the Contract and for breach of the Renewal Contract.  ROA.304.

## IV.   Neither Golf Channel Nor Stanford's Marketing Officer Who Negotiated the Contract Had Any Knowledge of Stanford's Ponzi Scheme

At the time of the execution of the Contract until the end of the Contract's terms, neither Knapp nor anyone else at Golf Channel knew that Stanford was operating a Ponzi scheme.  ROA.304.  Until Stanford missed its final payment under the Contract and its initial payments under the Renewal Contract and was soon thereafter placed into receivership, Golf Channel believed that Stanford was solvent and a legitimate business, and had no reason to believe otherwise. ROA.304.

Suzanne Hamm, Stanford's Chief Marketing Officer who negotiated the Contract on behalf of Stanford, had no knowledge of Stanford's Ponzi scheme until Stanford was placed into receivership and accused of running a Ponzi scheme. ROA.322-23.  Ms. Hamm was not prosecuted in connection with the Stanford Ponzi scheme, and following the collapse of the scheme, she was hired by Capital One Bank to serve as director of sponsorships, local marketing, and corporate hospitality.  ROA.316-17, 329-30.

The Receiver has conceded that Stanford did have some sources of legitimate income (ROA.362), but for purposes of its Motion for Summary Judgment, Golf Channel accepted that most of the monies paid to Golf Channel under the Contract came from the fraudulent sale of CDs by Stanford.

## V.    Appellants' Allegations

### A.    The Complaint

The factual allegations in the live Complaint consist of the following:  (1) Stanford was running a Ponzi scheme by selling fraudulent CDs, and (2) Stanford made payments to Golf Channel from the proceeds of the sale of the CDs. ROA.187-91.  The Complaint asserts no facts regarding Golf Channel's actions, other than the fact that it received payments from Stanford that were derived from the proceeds of the sale of CDs.  The Complaint contains no allegations regarding what Golf Channel provided to Stanford under the Contract.  The Complaint rests

- 13 -

Appellants' right to relief upon the argument that as a matter of law "providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value."  ROA.195.  The Complaint does not describe any specific services that Golf Channel provided, nor does it make any allegation as to how those "services" extended the Stanford Ponzi scheme.

## B.    Deposition Testimony of the Receiver and the Committee Chairman

When asked at his deposition how Golf Channel extended the Stanford Ponzi scheme, the Receiver testified that "*[m]y understanding* is by providing services to the Stanford entities, which was marketing, it enabled the Stanford entities to develop a reputation and a standing in the community which enhanced the Ponzi scheme and enabled their ability to continue selling CDs."  ROA.354 (emphasis added).  When the Receiver was then asked what services Golf Channel provided to Stanford, his response was "*[m]y understanding* was advertising and marketing services."   ROA.354 (emphasis added).   When John Little, the Chairman of the Committee ("Chairman"), was asked at his deposition to explain what Golf Channel provided to Stanford and how Golf Channel extended the Stanford Ponzi Scheme, he testified that "*[w]hat I understand* is that some form or fashion of advertising exposure via Golf Channel."  ROA.365 (emphasis added). and "*[w]ell, my appreciation of it* is really in two respects, and that is the – Golf

- 14 -

Channel expanded Stanford's brand, if you will, and helped it attract both more brokers and more brokerage customers." ROA.366 (emphasis added).

In their depositions, both the Receiver and Chairman conceded that they had no knowledge regarding the underlying facts of the transaction between Golf Channel and Stanford, or the alleged causal impact of Stanford's advertisements. Specifically:

- Neither the Receiver nor the Chairman read the Contract or had any knowledge of the terms of the Contract before filing this lawsuit or at any point before their depositions. ROA.354-55, 365.

- Neither the Receiver nor the Chairman has any opinion on whether Golf Channel knew about Stanford's Ponzi scheme or acted in good faith. ROA.359.

- Neither the Receiver nor the Chairman has a position as to whether what Golf Channel sold Stanford was based on market rates under an arm's length transaction. ROA.357-58, 360-61, 367.

- Neither the Receiver nor the Chairman know what Golf Channel actually did under the Contract; and the Receiver specifically testified that "*I don't know what Golf Channel provided to Stanford. I have no knowledge.*" ROA.355, 357 (emphasis added).

- Neither the Receiver nor the Chairman has actually seen the commercials, the billboards, or the messages that Stanford ran on Golf Channel or knows whether Stanford specifically marketed the sale of CDs under its media sponsorships purchased from the Golf Channel. ROA.355, 357, 365-66.

- Neither the Receiver nor the Chairman could identify a single investor that purchased a CD from Stanford or a broker who decided to work for Stanford because he or she saw a Stanford commercial, billboard, or message on Golf Channel. ROA.357, 366-67.

The Receiver testified that he did not consider any of these facts relevant to Appellants' claims for relief. ROA.355, 357. The Receiver did understand that there was a written Contract between Golf Channel and Stanford (ROA.354, 357), but Appellants have not alleged at any point in this dispute that the Contract is void or illegal. *Compare* ROA.271, 281-82, 5958 *with* ROA.184-99, 375-403, 5481-5502, 5908-18. Asked whether he believed that Golf Channel's connection to Stanford's Ponzi scheme was innocent, the Receiver stated that "I don't have any belief whether the Golf Channel was innocent or not." ROA.360.

### C.     Summary Judgment Arguments and Allegations Raised for the First Time on Appeal

In their Motion for Summary Judgment, Appellants argued that the "alleged market value" or "literal value" of Golf Channel's services could not confer value as a matter of law because Golf Channel exchanged those services in a contract with a Ponzi scheme. ROA.398. Appellants asserted in response to Golf Channel's Motion for Summary Judgment that any factual distinctions between innocent trade creditors like Golf Channel and other transferees such as direct salesmen of fraudulent investments are "irrelevant facts," and that because Golf Channel conducted business with a Ponzi scheme, the "market value of those services is irrelevant." ROA.5493-94. Appellants generally described Golf Channel's performance under the Contract as "advertising services" and a

- 16 -

"platform" upon which "*Stanford* furthered its Ponzi scheme by advertising." ROA.389-92, 397 (emphasis added).

In their March 5, 2014 Brief of Appellants ("Brief" or "Br."), Appellants for the first time contest two factual matters which they previously conceded or did not address: the fair market value of media sponsorships sold by Golf Channel and the nature of Golf Channel's performance under the Contract. Br. at 30-32, 53-57.

The District Court noted in its Order that it is undisputed in the record that Golf Channel sold the media sponsorships at arm's length for fair market value. ROA.6496-97. The District Court summarized that Golf Channel "offered Stanford a variety of paid media services" including commercial air time, coverage of the Stanford St. Jude Championship, and logo exposure, but that Golf Channel did not control the content of Stanford's advertising, have input regarding Stanford's media strategy, or design the advertisements themselves. ROA.6494-95. The District Court also noted that the aired advertisements and sponsorships were "primarily institutional . . . rather than directly promoting the sale of CDs." ROA.6494.

## SUMMARY OF THE ARGUMENT

### I.    It Is Undisputed That Golf Channel Received the Transfers in Good Faith and for Reasonably Equivalent Value as Defined by UFTA

In the summary judgment briefing, Appellants did not dispute any of the relevant facts in the record showing that Golf Channel received the payments in good faith and in exchange for reasonably equivalent value, including facts regarding:  (1) Golf Channel's lack of knowledge of the Ponzi scheme; (2) the market rates of the sponsorships; (3) the arm's length nature of the Contract, and (4) the nature of Golf Channel's performance under the contract.  Any implied factual dispute set forth in Appellants' Brief was not asserted in prior briefing, is not supported by the record, and is therefore waived.  Thus, the District Court properly determined in its Order that the transfers were received in good faith and that there was reasonable equivalence in the value exchanged, and focused its analysis on whether Golf Channel's provision of media sponsorships to Stanford conferred value as a matter of law under Appellants' assertion of a categorical exception for services rendered to a Ponzi scheme.

### II.    The District Court Did Not Err in Holding That Golf Channel's Sale of Media Sponsorships Conferred Value as a Matter of Law

Rather than dispute any pertinent facts on Golf Channel's affirmative defense, Appellants base their claim for relief by arguing that an unprecedented categorical exception precludes value from being conferred under UFTA when

services are provided to a Ponzi scheme, regardless of the market value or party involved in such an exchange. Under Appellants' argument, the UFTA affirmative defense would be rendered meaningless for any recipient of a transfer from a Ponzi scheme, no matter how remote from the scheme itself. The inapposite authority Appellants rely upon does not support such a broad, categorical rule.

Appellants' argument also ignores the fact that Golf Channel is itself a creditor still owed money by Stanford. If the goal of UFTA is to protect creditors and examine value from the perspective of the creditors, as Appellants repeatedly emphasize, this lawsuit seeks to rob Peter to pay Paul rather than actually preserve the debtor's estate. As a trade creditor that received partial payment of an arm's length, fair market value contract, Golf Channel is no differently situated under UFTA than an investor who received some return of principal on a fraudulent investment. Just as investors are allowed to retain the return of principal (but not any false "profits") under applicable UFTA precedent, so too should Golf Channel be permitted to retain payment received for performance under the Contract.

The District Court correctly interpreted and applied applicable UFTA statutory language and relevant precedent to determine that the sale of media sponsorships did confer value as a matter of law at the time of the transfers, and that any specific Ponzi scheme public policy exception, if one exists, does not extend to innocent trade creditors such as Golf Channel.

- 19 -

**III.    There Is Zero Evidence in the Record That Golf Channel Provided "Services Directed at Expanding a Ponzi Scheme"**

Even if Appellants' legal theory of a categorical Ponzi scheme exception is valid against vendors and trade creditors, Appellants by virtue of their articulated rule must show that Golf Channel provided "services directed at expanding a Ponzi scheme" in order to negate the undisputed facts proving Golf Channel's affirmative defense.  There is no evidence in the record to support this; only pure speculation.

## ARGUMENT

**I.    Legal Standards**

**A.    UFTA**

The UFTA statutes in Florida and Texas are essentially identical.  *Compare* TEX. BUS. & COMM. CODE §§ 24.001 *et seq with* FLA. STAT. §§ 726.101 *et seq.*  A transfer made by a debtor with "intent to hinder, delay or defraud" is considered fraudulent as to a creditor and is voidable under UFTA.  TEX. BUS. & COMM. CODE § 24.005(a)(1); FLA. STAT. § 726.105(1)(a).  UFTA, however, explicitly protects certain transferees because "a transfer or obligation is not voidable  . . . against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."   TEX. BUS. COMM. CODE § 24.009(a); FLA. STAT. § 726.109(1).  And even if a transfer may be avoided, if the transferee received in good faith, the transferee is entitled to offset any liability "to the extent

of the value given the debtor for the transfer or obligation." TEX. BUS. & COMM. CODE § 24.009(d)(1); FLA. STAT. § 726.109(4).

Under UFTA, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." TEX. BUS. & COMM. CODE § 24.004(a); FLA. STAT. § 726.104(1). "'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TEX. BUS. & COMM. CODE § 24.004(d). While the Florida UFTA statute does not contain a provision similar to TEX. BUS. & COMM. CODE § 24.004(d), courts applying the Florida UFTA statute have followed a similar test when determining reasonably equivalent value by using a totality of the circumstances test that "includes the consideration of a variety of factors, such as the fair market value of the item or service received compared to the price paid, the arm's length nature of the transaction, and the good faith of the transferee." *In re Tower Environmental, Inc.*, 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998); *see also Mitutoyo Am. Corp. v. Suncoast Precision, Inc.*, Case No. 8:08-mc-36-T-TBM, 2011 WL 2802938 at *7-8 (M.D. Fla. July 18, 2011).

Texas courts making a factual determination on reasonably equivalent value consider similar factors. *See, e.g., Mladenka v. Mladenka*, 130 S.W.3d 397, 407

- 21 -

(Tex. App.—Houston [14th Dist.] 2004, no pet.) (analyzing market value of house and whether transfer was an arm's length transaction); *Corpus v. Arriaga*, 294 S.W.3d 629, 636 (Tex. App—Houston [1st Dist.] 2009, no pet.) (concluding that insider daughter's contribution to mortgage in exchange for the transfer of the property was far less than the value of the property as measured by the price for which the property would sell in an arm's length transaction at the time of the transfer).     Finally, the United States Supreme Court considers reasonably equivalent value to mean "the debtor has received value that is substantially comparable to the worth of the transferred property." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994) (affirming holding that price received at foreclosure sale conclusively established reasonably equivalent value).

Under the basic rules of statutory construction, courts must determine and give effect to the legislative intent of the statute by first looking at the language of the statute. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000); *Heart of Adoptions, Inc. v. J.A.*, 963 So.2d 189, 198 (Fla. 2007).  If the meaning of the language is unambiguous, courts should adopt the interpretation supported by the plain meaning of the provision's words. *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997); *Holly v. Auld*, 450 So.2d 217, 219 (Fla. 1984). "[W]hen a court interprets a statute, it must give full effect to *all* statutory provisions.  Courts should avoid readings that would render part of a statute

meaningless. *Mendenhall v. State*, 48 So.3d 740, 748 (Fla. 2010) (citations omitted) (emphasis in original); *Columbia Med. Ctr. Of Las Colinas v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008).

### B.    Choice of Law

Appellants argue that Golf Channel has conceded application of TUFTA, despite the fact that the Contract was executed and performed in Florida, because Golf Channel has filed a motion to recover legal fees pursuant to TUFTA subsequent to the District Court's Order.  Br. at 22.  Appellants also argue that any reference to Eleventh Circuit fraudulent transfer jurisprudence is irrelevant.  Br. at 20-22.  Under this matter's current disposition, the District Court has granted Golf Channel's Motion for Summary Judgment under the holding that there is no conflict of law among UFTA states and by citation primarily to TUFTA (ROA.6495-97), and also explicitly granted Golf Channel the right to seek attorneys' fees under TUFTA despite Appellants' opposition.  ROA.117-20.  Until this current disposition changes, Golf Channel is entitled to pursue its as of yet ruled upon motion for attorneys' fees, but this in no way "concedes" that Texas law applies to this dispute as the forum with the most significant relationship.  *See also* ROA.5902-04.

In any case, Golf Channel agrees with the District Court that because the UFTA statutes are nearly identical, the statutory text and comments do not provide

an exclusive definition of value, and UFTA's definition of value is derived from section 548(d)(2)(A) of the Bankruptcy Code, bankruptcy cases and federal case law from other circuits and districts such as the Eleventh Circuit cases cited in the summary judgment briefing and the District Court's Order are persuasive in analyzing the issue of value. ROA.6498. To this end, it should be noted that Appellants rely heavily upon this Court's decision in *Warfield v. Byron,* 436 F.3d 551 (5th Cir. 2006), which applied Washington UFTA law and relied upon bankruptcy and federal case law from outside the Fifth Circuit for its analysis of reasonably equivalent value.

As noted in the summary judgment briefing, neither Golf Channel nor (presumably) Appellants have located a single decision of a fraudulent transfer action brought against an innocent trade creditor or vendor. ROA.5459-60, 5900-01. The few decisions that reference even the possibility of such a dispute are outside of Texas and the Fifth Circuit, and as the only available points of reference, are relevant and persuasive to this case, regardless of which state's UFTA law ultimately applies.

**II.    The District Court Correctly Held That Golf Channel Received the Transfers in Good Faith and Exchanged Reasonably Equivalent Value as Defined by UFTA**

Golf Channel adduced substantial evidence in the record showing that it received the transfers from Stanford under the Contract in good faith and in exchange for reasonably equivalent value.  For example:

- Golf Channel had no knowledge of the Stanford Ponzi scheme.  ROA. 304.

- Golf Channel negotiated the Contract with Stanford at arm's length. ROA.300-02, 306-08, 317-20, 323, 331, 339-40, 350-51.

- Golf Channel sold media sponsorships to Stanford at market rates. ROA.302-03, 306-08, 310, 319-20, 331, 350.

- Golf Channel's Contract with Stanford was a legal contract, and there is no allegation in the record that the Contract is void or illegal. *Compare* ROA.271, 281-82, 301-08, 5958 *with* ROA.184-99, 375-403, 5481-5502, 5908-18.

- Golf Channel fully performed its obligations under the Contract and is a creditor of Stanford still owed money thereunder.  ROA.303-04, 312-13, 326-27.

- Golf Channel provided no marketing or advertising advice to Stanford but merely sold Stanford air time and provided some production-related services.  ROA.303, 324-24.

- The commercials and other media sponsorships aired by Stanford on the Golf Channel were designed by Stanford and contained no reference to CDs or any other specific investment product.  ROA. 302-03, 310, 323-24.

Appellants did not dispute any of these facts before the District Court. ROA.5455, 5898-99.  In its Order, the District Court properly held that there is no

dispute that Golf Channel received the transfers in good faith.  ROA.6496.  The District Court also properly held that there was no dispute in the record regarding the *reasonable equivalence* of the exchange under the Contract; the only dispute centered on whether the exchange could be considered *value* as a matter of law.  ROA.6496-97.  Specifically, the District Court held that "based upon the summary judgment record, Golf Channel provided its services to Stanford within the range of value that would have obtained in an arm's length transaction and that, in fact, the transaction between Golf Channel and Stanford was an arm's length transaction."  ROA.6496-97 (citing TEX. BUS. & COMM. CODE § 24.004(d)).  The undisputed facts support this conclusion.

For the first time on appeal, Appellants now contend that Golf Channel may not have sold the media sponsorships for fair market value, or that a fact issue may exist regarding the market value of the air time purchased by Stanford.  Br. at 56-57.  "[A]rguments must be briefed to be preserved," so by failing to raise this issue at any point before District Court, Appellants have waived the ability to argue that the Contract was anything but in good faith, at arm's length, at fair market value, and in the ordinary course of business.  *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993) (quoting *Price v. Digital Equip. Corp.*, 846 F.2d 1026, 1027-28 (5th Cir. 1988)); *see also In re Texas Mortgage Servs.*, *Inc.*, 761 F.2d 1068, 1073-74 (5th Cir. 1985).

### III. The District Court Correctly Held That Golf Channel's Sale of Media Sponsorships Conferred Value as a Matter of Law

#### A. Appellants' Argument for a Categorical Ponzi Scheme Exception

Appellants base their theory of recovery on a supposed categorical exception to UFTA's definition of value whereby services "directed at extending a Ponzi scheme" do not provide value as a matter of law, and the allegation that Golf Channel's performance under the Contract supposedly was "directed at expanding the Ponzi scheme." Br. at 24-29. Appellants contend that the District Court applied the wrong legal standards in its value analysis by, among other things, failing to analyze value from the perspective of the creditors, and failing to faithfully apply *Warfield*, which Appellants claim controls the outcome of this case. Br. at 35-48. Appellants also argue that the "consumables" and "speculative investment cases" cited by the District Court are irrelevant and unsupported by any statute. Br. at 41-44, 50-53.

There is, however, no statutory reference in UFTA specific to Ponzi schemes, much less an exception written into the definitions of value or reasonably equivalent value. Instead, Appellants argue that this rule is consistent with certain precedent and Comment 2 to Section 3 of the UFTA statute stating that value must be construed in light of the purpose of the UFTA statute which is to "protect the creditors." Br. at 25. Appellants contend that any services rendered to a Ponzi

- 27 -

scheme that allow that scheme to expand, no matter how far removed from the scheme itself, ultimately harm the creditors and cannot confer value as a matter of law.  Br. at 26-27.  Appellants do not explain what it means to provide "services directed at extending a Ponzi scheme," nor do they suggest that there is any limiting principle to this rule.

## B. Appellants' Authority Does Not Support Application of a Categorical Public Policy Ponzi Scheme Exception for Innocent Trade Creditors and Vendors

The inapposite authority Appellants rely upon does not prescribe a broad categorical Ponzi scheme exception to UFTA's definition of value.  Appellants claim that this Court's decision in *Warfield* controls the outcome of this case and state that "*Warfield* held that services directed at extending a Ponzi scheme do not constitute value under UFTA."  Br. at 44. (citing 436 F.3d at 560).  Appellants construe *Warfield* too broadly.

In *Warfield*, an investor in a Ponzi scheme received "an extraordinarily high return" on his investment and further helped the company recruit new investors, for which he received "commissions" and "earnings" payments.  436 F.3d at 555.  Most of the other investors in the same scheme lost money.  *Id.* The investor claimed that the additional payments he received were exchanged in consideration of his solicitation of new investors in the scheme.  *Id.* at 559-60.  This Court held that the investor's efforts to directly secure new investments for the scheme could

not be considered an exchange of value for his earnings, and in so doing relied upon cases from other jurisdictions where brokers or investors received "commissions" or referral fees in excess of any amounts originally invested in return for the solicitation and/or referral of new investors. *Id.* at 560 (citing *In re Ramirez Rodriguez*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997); *Randy v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995); *Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*, 160 B.R. 1, 16 (Bankr. D.D.C. 1993)).

Even if *Warfield* creates a *per se* rule that the direct solicitation of new investors for a Ponzi scheme in exchange for commissions cannot constitute value, its analysis was specific to a particular type of transaction, in part because the procurement or sale of a fraudulent investment product creates an illegal, unenforceable contract, which by law is of no value. *Id.* (citing *In re Randy*, 189 B.R. at 438-39 and *In re Int'l Loan Network, Inc.*, 160 B.R. at 16). *Warfield* makes no broad pronouncement regarding other types of transactions with Ponzi schemes, such as legally enforceable contracts with innocent trade creditors in the ordinary course of business. As the District Court noted, even *In re Randy*, upon which *Warfield* relied, acknowledged that a different value analysis would likely be necessary for those who provide ordinary services to a Ponzi scheme. R.6506. (citing *In re Randy*, 189 B.R. at 442).

- 29 -

The other cases relied upon by Appellants are similarly distinct from this case, as they involve both good faith problems such as insider transactions, and valuation problems such as lack of adequate consideration and/or grossly inequivalent value exchanged.  *See, e. g., S.E.C. v. Resource Dev. Intern., LLC*, 487 F.3d 295 (5th Cir. 2007) (Ponzi scheme debtor reimbursed a third party its attorneys' fees of the individual who organized and operated the Ponzi scheme *after* the individual schemer's assets were frozen but before the assets of the debtor corporation at the heart of the Ponzi scheme had been frozen); *In re Hinsley*, 201 F.3d 638, 640-41 (5th Cir. 2000) (transfer of property to wife in excess of her community property assets designed to keep the assets of the bankrupt debtor husband out of the reach of his creditors); *S.E.C. v. Harris*, C.A. No. 3:09-CV-1809-B, 2010 WL 3719318 at *2 (N.D. Tex. Sept. 7, 2010) (Stickney, J.) (transfer of "gift amount" to charity in exchange for event tickets provided to individuals running the Ponzi scheme).  Here, the District Court explicitly differentiated the value of Golf Channel's consideration in this case from cases involving political or charitable contributions.  ROA.6504. (citing *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013), and *Scholes v. Lehmann*, 56 F.3d 750, 759 (7th Cir. 1995)).

These cases are unhelpful in determining whether payments under an arm's length, market value vendor transaction with a Ponzi scheme is subject to disgorgement under UFTA.

### C.    There Is No Authority That Justifies Avoidance of Transfers to Arm's Length Vendors and Trade Creditors

In fact, neither Golf Channel nor Appellants have located a single case from any jurisdiction where a fraudulent transfer action was asserted against an innocent trade creditor or vendor.   The few cases which even consider the possibility summarily assume that good faith vendors and trade creditors would not be subject to avoidance.   *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002); *In re Randy*, 189 B.R. at 442.   The *World Vision* court aptly illustrated the problem with Appellants' position:

> Just because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance.  If so, every vendor supplying goods to the debtor would receive an avoidable fraudulent transfer when the debtor paid the vendor's invoice.  Every employee, even lower-tiered custodial and clerical employees, would be required to return their wages, regardless of the work they performed.  Landlords would have to return rent payments, even if the debtor actually occupied the leased premises.  No one conducting business with a debtor operating a Ponzi scheme could prevent the avoidance of payments received from the debtor, regardless of the extent of the transferee's knowledge or culpability or the actual services provided.  The law does not require this result.

275 B.R. at 658. The *World Vision* court recognized that the value analysis of services or products for different types of transferees falls along a divergent spectrum, wherein the brokers represent a "middle ground, a third type of recipient" between innocent, arm's length transferees such as vendors and the insiders that actively perpetuated the Ponzi scheme. *Id.* at 659. Thus, while there is some split of authority regarding the avoidance of brokerage commissions and "false profits" to investors, there is no authority that justifies the avoidance of transfers to innocent third party vendors and trade creditors.

**D.    The District Court Properly Considered Value From the Perspective of the Creditors and Consistent With the Policy Concerns of UFTA**

Contrary to Appellants' assertion, the District Court did consider the policy of UFTA to protect creditors, in light of the fact that Golf Channel itself is a creditor of Stanford:

> The Court's conclusions that Golf Channel provided value is consistent with public policy. First, the Receiver's position would simply favor one group of creditors – investors – over another group – trade creditors. "Unless one creditor is more culpable than another, there is no reason to prefer one creditor over another." 3 Roy S. Gieger, Bankruptcy Litigation § 17:83 (Westlaw 2013) (discussing reasonably equivalent value for things useless to unsecured creditors). Second, the Receiver's position would shift the risk of loss, and the corresponding duty to investigate, from investors and brokers to trade creditors. It is impractical to expect trade creditors to conduct a forensic investigation into the business of all their customers in the ordinary course of business. On the other hand, investors (or

their advisors) should assess the risk of their investment and the corresponding potential reward as a matter of course.

ROA.6504. As a trade creditor which is still owed money for services rendered to Stanford, Golf Channel is no differently situated than an innocent Stanford investor.

While courts are split as to whether investors can retain "false profits" received in excess of the amount of principal invested with a Ponzi scheme, the District Court recognized in another Stanford proceeding that "the vast majority of courts addressing the issue" have held that "a Ponzi scheme investor may recover payments made up to his principal investment." *Janvey v. Alguire*, Case No. 3:10-cv-00931-N-BL, 2013 WL 2451738 at *9 n.8 (N.D. Tex. Jan. 22, 2013) (citing *Donnel v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008); *In re AFI Holding, Inc.*, 525 F.3d 700, 708-09 (9th Cir. 2008); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) ; *In re Hedged-Inv. Assocs., Inc.*, 84 F.3d 1286, 1289-90 (10th Cir. 1996)).

This return of principal logic is the same with both investment creditors and trade creditors: allowing a creditor to be made whole or retain what it is owed does not harm the creditors or deplete the debtor's estate, but to disgorge these payments that made creditors whole only serves to randomly favor and redistribute to one class of creditors at the expense of another. Thus, Appellants' efforts to avoid payments to Golf Channel would merely redefine the pool of Stanford

creditors without accomplishing the UFTA policy objective Appellants so heavily emphasize.

The District Court's analogy to consumables and speculative investment cases properly illustrates the problem with Appellants' expansive theory of disgorgement, and their formulaic reliance on the language in Comment 2 to UFTA Section 3. ROA.6499-6504. As the District Court notes, "the statutory text is not an exclusive definition of value" and it does not identify "what else might constitute value, or indeed what else might not constitute value beyond the exemplars of love and affection." ROA.6498. The District Court also notes that under Fifth Circuit precedent, value is to be determined at the time the investment was made. ROA. 6499-6501, 6503 (citing *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126-27 (5th Cir. 1993)).

The air time Golf Channel sells to sponsors have a robust fair market value regardless of how that air time is ultimately used. One need only watch the first quarter of the Super Bowl to recognize the independent value of media sponsorships and the myriad possible uses for it. Thus, to purchase a media sponsorship is to obtain something of value, even if it is ultimately used or consumed prior to any ability to collect on behalf of creditors. If only tangible or liquid assets constituted value for UFTA, all payments to utility companies, internet providers, or other trade creditors of consumable goods and services would

be avoidable without recourse.  ROA.6503.  "This result is of course nonsense." ROA.6503 (citing *e.g., Samson v. U.S. West Commc'ns, Inc. (In re Grigonis)*, 208 B.R. 950, 955-56 (Bankr. D. Mont. 1997)).

To the extent Golf Channel's air time was ultimately used by Stanford to promote and extend its Ponzi scheme, so too were investment dollars received from innocent creditors as well the electricity, internet, and any number of other consumable goods and services Stanford purchased in order to run its Ponzi scheme.  Not only would application of Appellants' broad rule merely create a new class of innocent creditors, it would impose a new duty for commercial vendors to investigate and insure the solvency of customers who purchase their goods and services.  If the law imposed this externality on media companies to vet potential sponsors (to the extent existing law would even allow such a process), either advertising costs would drastically increase or advertising would cease and the cost of media viewership would be borne wholly by consumers.

In other words, Appellants' legal theory would impose a significant chilling effect on the ability of vendors and trade creditors of consumable goods and services to conduct business.  In light of the public policy considerations at issue, the District Court was correct in holding that there is no reason to "shift the risk of loss, and corresponding duty to investigate, from investors to trade creditors." ROA.6504.

**IV.  There Is Zero Evidence in the Record That Golf Channel Provided "Services Directed at Expanding a Ponzi Scheme"**

**A.  The District Court Correctly Held That Golf Channel Was a Trade Creditor**

Appellants argue for the first time on appeal that Golf Channel was not a trade creditor and accuse Golf Channel of mischaracterizing the nature of its performance under the Contract.  Br. at 32, 53-57.  Appellants repeatedly refer to the Contract as a "partnership" and claim that Golf Channel actively promoted Stanford as opposed to merely selling media sponsorships.  Br. at 5-7, 29. Appellants claim that the purchase of air time by Stanford was a "relatively minor part" of what was provided under the Contract and allege, without any citation to the record, that "Stanford did not pay $5.9 million for 'air time' or a 'platform.'" Br. at 32, 53-57.

Appellants' revisionist portrayal of the Contract is directly contradicted by the record.  The Contract does include the word "Partnership," but is on its face (and undisputed in the record) an arm's length commercial agreement, and not a legal partnership with a sharing of profits.  ROA.301-308, 6496-97.  Appellants also seem to mistakenly assume that "commercials" are the only form of air time and that other provisions of the Contract somehow involved greater promotion and involvement by Golf Channel in Stanford's marketing strategy.  Br. at 30-32, 53-57.  With the exception of two production costs (one of which was never provided

or paid for), nearly the entire Contract amount was allocated to various types of media sponsorships or "air time" such as commercials, billboards (i.e., logos) on live sets, graphic logos on-screen during broadcasts and score updates, and the airing of "Eagles for St. Jude" video clips.  ROA.302, 306-08, 310.

The purchase of media sponsorships (i.e., air time) in various forms accounted for $5,650,000 of the $5.9 million paid under the Contract, so Stanford did in fact pay nearly $5.9 million solely for the right to advertise on Golf Channel's network in various formats.  ROA.306-08.  In fact, Golf Channel's reference to these media sponsorships as a "platform" in the summary judgment record, now disputed in Appellants' brief, is a quotation from Appellants' characterization of the Contract in their summary judgment briefing, which assigned exclusive agency to Stanford with regard to the "promotion" of Stanford's scheme.  *Compare* ROA.389-92, 397 *and* ROA.5460-61 *with* Br. at 32.  The examples of these various media spots included in the record speak for themselves and are consistent with Golf Channel's characterization of a television network selling air time to a sponsor without getting involved in the sponsor's business or marketing strategy; in other words, an arm's length trade creditor.  *See* ROA.310.

Golf Channel, like any innocent vendor, had no "objective" or "purpose" to promote and expand Stanford's Ponzi scheme.  *See* Br. at 29, 33-34.  Like any vendor, Golf Channel is not involved in the business considerations or strategies of

- 37 -

its sponsors beyond the mere offering of a valuable and content-neutral commodity of air time on its network. With Stanford, as with any other advertiser, Golf Channel's sole purpose or objective was to sell that air time to an advertiser, who could use the time for its own purposes and objectives.

Also, neither the Chairman nor the Receiver had any knowledge regarding the details of the Contract prior to suing Golf Channel or at the time of their depositions. ROA.354-55, 357-61 365-67. In the summary judgment briefing, Appellants did not dispute any fact regarding Golf Channel's performance under the Contract, despite Golf Channel's repeated emphasis that they were ignoring these facts. ROA.5455, 5898-99. By not disputing this evidence in the summary judgment briefing, Appellants have waived their right to do so on appeal.

### B.     There Is No Evidence That Golf Channel's Performance Under the Contract Furthered the Stanford Ponzi Scheme

Appellants have also failed to adduce any evidence that Golf Channel's sale of media sponsorships actually extended Stanford's Ponzi scheme. In the summary judgment record, Appellants offered conclusory speculation that such an effect was "undeniable," "beyond dispute," and that Golf Channel "inarguably" extended Stanford's Ponzi scheme by attracting new investors. ROA.397-98. However, neither Stanford's Chief Marketing Officer nor the Receiver or Chairman are aware of any single investor out of more than 21,000 investors, who

- 38 -

purchased a CD because of a Stanford advertisement on Golf Channel's network. ROA.357, 366-67, 5474-75. The two pieces of evidence Appellants cited in their Motion for Summary Judgment, one of which was inadmissible hearsay[3] and another of which was a misleading quotation, do not support this claim. ROA.5449-55. Unlike a broker who directly sells a fraudulent investment product, the speculative causal link between Golf Channel's sale of media sponsorships and Stanford's perpetuation of a Ponzi scheme is severely attenuated, no less so than the causal link between any other trade creditor and Stanford's scheme. ROA.5462-64. Thus, even if Appellants' Ponzi scheme exception is a valid legal theory, they have not adduced any evidence to support its application or to preclude a finding of value under the undisputed record. ROA.5456, 5465.

---

[3] Golf Channel objected to Appellants' reliance upon the "Comperio Research" reports as unauthenticated and inadmissible hearsay. ROA.5451-52. Appellants submitted a Supplemental Appendix with their Reply in Support of Motion for Summary Judgment, which sought to authenticate the reports. ROA.5928-6334. Golf Channel filed an Objection to this Supplemental Appendix, which included new evidence submitted for the first time with the reply brief. ROA.6359-66. The District Court ultimately did not consider the evidence because it made its ruling without examining whether Stanford's advertisements on Golf Channel's network led to additional CD investors; therefore, it denied Golf Channel's Objection as moot. ROA.6507. To the extent consideration of this evidence is deemed necessary by this Court, Golf Channel hereby reasserts its objection to the inclusion of documents located at ROA.4861-4943, 4964-5244 (Exhibits 15-17, 20 to Appellants' Motion for Summary Judgment) in support of Appellants' argument, and further reasserts its Objection to Appellants' Supplemental Appendix located at ROA.5928-6334. The evidence is inadmissible hearsay without foundation and in any case, late filed. *See also* ROA.5451-52, 6359-66.

## CONCLUSION

The District Court was correct in granting Golf Channel's Motion for Summary Judgment and denying Appellants' Motion for Summary Judgment. It is undisputed that Golf Channel received the transfers at issue from Stanford in good faith pursuant to an arm's length contract, and that it sold Stanford media sponsorships at fair market value. Under UFTA, Golf Channel has proven its affirmative defense as a matter of law. Appellants' assertion of a categorical exception whereby services rendered to a Ponzi scheme cannot constitute value as a matter of law, even by an innocent trade creditor like Golf Channel, is not supported by any authority or public policy justification. There is also no evidence in the record that Golf Channel's act of merely selling air time to Stanford actually furthered or extended Stanford's Ponzi scheme.

Accordingly, Golf Channel respectfully prays for summary affirmance of the District Court's Order, for recovery of its costs, and for such other and further relief to which it may be entitled at law or in equity.

Respectfully submitted,

FULBRIGHT & JAWORSKI LLP


By:/s/ Theodore W. Daniel

    Theodore W. Daniel
    State Bar No. 05362400
    ted.daniel@nortonrosefulbright.com
    Oscar Rey Rodriguez
    State Bar No. 00791557
    rey.rodriguez@nortonrosefulbright.com
    Kyle Schindler
    State Bar No. 24066033
    kyle.schindler@nortonrosefulbright.com
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784
Telephone: (214) 855-8000
Facsimile:  (214) 855-8200

COUNSEL FOR DEFENDANT-
APPELLEE, TGC, LLC d/b/a GOLF
CHANNEL

## CERTIFICATE OF SERVICE

I certify that on April 7, 2014, a copy of the Brief of Appellee TGC, LLC d/b/a GOLF CHANNEL was filed using the U.S. Court of Appeals for the Fifth Circuit's ECF/CM system and all counsel of record listed below were served using the court's electronic Notice of Docket Activity pursuant to 5th Cir. R. 25.2.5.

| | |
|---|---|
| Douglas J. Buncher | Kevin M. Sadler |
| Negligan Foley, LLP | Baker Botts L.L.P. |
| 325 N. St. Paul, Suite 3600 | 98 San Jacinto Blvd., Suite 1500 |
| Dallas Texas 75201 | Austin, Texas 78701 |

/s/  Theodore W. Daniel
Theodore W. Daniel

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2 and 32.3, the undersigned certifies this Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

1.     This brief contains 9,305 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 5th Cir. R. 32.2.

2.     This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word software in Times New Roman, 14-pt. font for text and Times New Roman 12-pt. font for footnotes.

3.     The undersigned counsel understands that a material misrepresentation in completing this certificate or circumvention of the type-volume limits in Fed. R. App. P. 32(a)(7) may result in the Court's striking the Brief and imposing sanctions against the person signing the brief.

/s/  Theodore W. Daniel
Theodore W. Daniel