No. 13-11305

In The

# United States Court of Appeals for the Fifth Circuit

RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER
FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL; OFFICIAL
STANFORD INVESTORS COMMITTEE,

Plaintiffs-Appellants,

v.

THE GOLF CHANNEL, INCORPORATED; TGC, L.L.C.,
DOING BUSINESS AS GOLF CHANNEL,

Defendants-Appellees.

On Appeal from the United States District Court for the
Northern District Of Texas, Dallas Division
Civil Action No. 3:11-Cv-294
Honorable David C. Godbey, Presiding

**APPELLEES' PETITION FOR REHEARING EN BANC**

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-0466

THEODORE W. DANIEL
KYLE M. SCHINDLER
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas  75201
(214) 855-8000

KATHERINE D. MACKILLOP
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095
(713) 651-5151

March 25, 2015

Counsel for Appellees

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned certifies that the parties listed below are the persons and entities interested in this appeal:

1.     Plaintiff-Appellant, Receiver Ralph S. Janvey

2.     Attorneys for Plaintiff-Appellant, Receiver Ralph S. Janvey

Kevin M. Sadler
Scott D. Powers
David T. Arlington
Stephanie F. Cagniart
Baker Botts L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701

Timothy S. Durst
Baker Botts L.L.P.
2001 Ross Avenue, Suite 600
Dallas, Texas 75201

3.     Plaintiff-Appellant Official Stanford Investors' Committee

4.     Attorneys for Plaintiff-Appellant, Official Stanford Investors' Committee

Nicholas A. Foley
Douglas J. Buncher
Negligan Foley L.L.P.
325 N. St. Paul, Suite 3600
Dallas, Texas 75201

Peter D. Morgenstern
Butzel Long PC
380 Madison Avenue, 22nd Floor
New York, NY 10017

Edward C. Snyder
Castillo Snyder, P.C.
300 Convent St., Suite 1020
San Antonio, Texas 78205

Edward F. Valdespino
Strasburger & Price L.L.P.
300 Convent St, Suite 1020
San Antonio, Texas 78205

5.    Defendant-Appellees TGC, LLC d/b/a Golf Channel and The Golf Channel,
Incorporated

6.    Attorneys for Defendant-Appellees

Norton Rose Fulbright US LLP

Theodore W. Daniel
Kyle M. Schindler
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201

Jonathan S. Franklin
Market Square
801 Pennsylvania Avenue, NW
Washington, D.C. 20004-2623

Katherine D. Mackillop
Fulbright Tower
1301 McKinney
Suite 5100
Houston, TX 77010-3095

/s/ Theodore W. Daniel
Theodore W. Daniel

## RULE 35 STATEMENT OF REASONS FOR EN BANC REVIEW

Under Fed. R. App. P. 35, appellees TGC, LLC d/b/a Golf Channel and the Golf Channel, Incorporated ("Golf Channel")[1] petition for rehearing *en banc* because the panel's decision conflicts with a prior decision of this Court on a question of exceptional importance.

Golf Channel fully performed under a lawful, enforceable, market-rate media sponsorship contract with one of the Stanford Financial entities ("Stanford"), without knowing that Stanford was operating a fraudulent Ponzi scheme. Yet the panel held that Golf Channel must return the entire consideration it received, on the theory that its services unwittingly furthered the Ponzi scheme and thus lacked any "value" under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Com. Code §§ 24.001 *et seq.* But in *Janvey v. Brown*, 767 F.3d 431 (5th Cir. 2014), a prior panel of this Court held that repayments made to investors in the Stanford scheme were ***not*** voidable under TUFTA because the payments were "payments of an antecedent debt." *Id.* at 443. Thus, even though the investors' contributions had served only to perpetuate the Ponzi scheme and deepen Stanford's insolvency, the Stanford receiver could not recoup them because the investors had a lawful, enforceable claim to retain those amounts.

---

[1] Although the Court's official caption lists two appellees, TGC, LLC d/b/a Golf Channel is the only defendant named in the First Amended Complaint and Final Judgment below. This petition is filed on behalf of both appellees out of an abundance of caution.

The decision in this case cannot be squared with the binding precedent of *Brown*. The panel held that Golf Channel's services had "no value" because they unwittingly furthered an insolvent Ponzi scheme. Slip op. 8-9. But *Brown* holds that the investments ***themselves*** had value within the meaning of TUFTA because, even though they deepened Stanford's insolvency, they offset lawful debts owed to the investors. Under *Brown*—which accords with the decisions of other Circuits that have addressed the issue—Golf Channel's services necessarily had value, because its contractual rights were lawful and valid and created an antecedent debt satisfied by the payments the Receiver seeks to recover.

Rehearing is further warranted because the panel's error, if not corrected, will negatively affect commercial transactions in this Circuit and elsewhere. The panel held that an innocent merchant that fully performed a valid, lawful contract must repay its entire consideration because it unknowingly dealt with, and thus unwittingly furthered the insolvency of, a fraudulent enterprise. This holding will severely chill legitimate commercial transactions. It imposes an impossible duty on innocent merchants to scrutinize each company they do business with to try to learn if it is engaged in unrelated fraud, and subjects them to the risk of having to disgorge their lawful compensation if it is later discovered that the company was engaged in a Ponzi scheme or similar fraud. Those who enter into illegal, unenforceable contracts with Ponzi operators cannot expect to profit from them.

But innocent merchants (and employees) who lawfully provide valuable goods and services in the ordinary course of business should not run the risk of ruin merely because their counterparty was, unbeknownst to them, engaged in fraud.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ........................................................i

RULE 35 STATEMENT OF REASONS FOR EN BANC REVIEW ...................iv

TABLE OF AUTHORITIES ................................................................ viii

STATEMENT OF THE ISSUE ...............................................................1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
    DISPOSITION ...............................................................................1

STATEMENT OF RELEVANT FACTS ..................................................2

ARGUMENT AND AUTHORITIES ........................................................3

    I.    THE PANEL DECISION CONFLICTS WITH *BROWN* ...................3

        A.    Under *Brown* And TUFTA, A Good Faith Transfer Has
            Value If The Transferee Has A Claim Or Right To
            Payment .....................................................................4

        B.    There Is No Ponzi Scheme Exception To The Definition
            Of Value ....................................................................8

    II.    THIS CASE INVOLVES AN ISSUE OF EXCEPTIONAL
        IMPORTANCE THAT THREATENS LEGITIMATE
        COMMERCIAL TRANSACTIONS IN THIS CIRCUIT AND
        ELSEWHERE ...............................................................13

    III.    THE COURT SHOULD AFFIRM THE JUDGMENT BUT
        MAY ALSO CERTIFY THE QUESTION TO THE TEXAS
        SUPREME COURT .......................................................14

CONCLUSION ....................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Austin v. Kroger Texas L.P.*,
  746 F.3d 191 (5th Cir. 2014) ............................................................15

*Donnel v. Kowell*,
  533 F.3d 762 (9th Cir. 2008) ...............................................................5

*In re Financial Federated Title & Trust*,
  309 F.3d 1325 (11th Cir. 2002) .......................................................12

*In re Hedged-Inv. Assocs., Inc.*,
  84 F.3d 1286 (10th Cir. 1996) .............................................................5

*Janvey v. Brown*,
  767 F.3d 431 (5th Cir. 2014) ......................................................*passim*

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
  699 F.3d 848 (5th. Cir. 2012) ...........................................................14

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) .................................................................5

*In re Universal Clearing House Co.*,
  60 B.R. 985 (D. Utah 1986)...............................................................12

*Warfield v. Byron*,
  436 F.3d 551 (5th Cir. 2006) ..........................................................5, 8

**Rules and Statutes:**

Fed. R. App. P. 35 ......................................................................iv, 12

Tex. Bus. & Com. Code §§ 24.001 *et seq.* .............................................iv

Tex. Bus. & Com. Code § 24.002(3) ...................................................4, 7

Tex. Bus. & Com. Code § 24.002(5) ...................................................4, 7

Tex. Bus. & Com. Code § 24.004(a) ...................................................4, 7

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Tex. Bus. & Com. Code § 24.009(a) .....................................................................4, 7

Tex. R. App. P. 58.1..................................................................................................15

Unif. Fraudulent Transfer Act § 3 cmt. 2 .............................................................10

**Other Authorities:**

Jay Adkisson, *Fifth Circuit Slices The Golf Channel Into The Pond*,
FORBES, March 18, 2015...................................................................................7, 8

John Council, *Golf Channel Bogeys Attempt to Keep Millions
Received From R. Allen Stanford*, TEXAS LAWYER, March 17, 2015 ...............14

## STATEMENT OF THE ISSUE

Whether the panel erred in holding, in conflict with *Janvey v. Brown*, 767 F.3d 431 (5th Cir. 2014), that an innocent merchant that lawfully contracts in the ordinary course of business and at market rates with a company it did not know was engaged in a Ponzi scheme must, under TUFTA, forfeit all of the payments received for its services even though investors in the same scheme who cashed in before discovery of the fraud do not forfeit the principal payments made to them.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION

Ralph Janvey, as the receiver of Stanford (the "Receiver") and the Official Stanford Investors Committee (collectively "Appellants") sued Golf Channel under TUFTA alleging fraudulent transfer and seeking to disgorge all payments Golf Channel received for its sale of media sponsorships to Stanford. ROA.32-49, 184-99. The parties filed competing motions for summary judgment.

The district court granted Golf Channel's motion, dismissing Appellants' claims with prejudice. ROA.6492-6508. The question was whether Golf Channel's services provided "reasonably equivalent value" for the consideration paid, such that Golf Channel has a valid defense to a fraudulent transfer claim. The district court noted that it was undisputed that Golf Channel received the payments in good faith and held that if Golf Channel's performance exchanged "value," as defined in TUFTA, that value was reasonably equivalent. ROA.6496-

1

97.  The court held that Golf Channel's sale of advertising time and related services constituted "value" under TUFTA, and that innocent trade creditors should not have to disgorge their lawful compensation simply because they unknowingly provided services to a Ponzi scheme.  ROA.6497-07.

On appeal, the panel reversed and rendered the district court's judgment, holding that while Golf Channel's services "may have been quite valuable to the creditors of a legitimate business," Golf Channel did not provide "value" as a matter of law under its contract because "services rendered to encourage investment [in a Ponzi scheme] do not provide value to the creditors."  Slip op. 8-9.  Golf Channel now petitions for rehearing *en banc*.

## STATEMENT OF RELEVANT FACTS

In 2006, Golf Channel, which operates a cable television network and provides golf coverage, entered into a two-year contract with Stanford for the purchase of media sponsorships, including the right to run commercials and sponsor various events on Golf Channel's network.  ROA.300-02, 306-08, 317, 323.  The contract was negotiated at arm's length, and the sponsorships were sold at market rates.  ROA.300-03, 306-08, 310, 317-20, 323, 331, 339-40, 350-51.

Golf Channel did not advise Stanford on how to brand its name, provide any marketing or advertising services to Stanford, or participate in the design or creation of the commercials or messages Stanford paid to run on Golf Channel's

network.  ROA.303, 323-24.  The content of those commercials and messages did not reference any of the fraudulent CDs or any other investment vehicle, but instead generically referenced Stanford, showed the Stanford logo, or referred to Stanford's charitable contributions.  ROA.302-03, 310, 324-25.

Golf Channel performed under the contract and Stanford paid all sums bargained for (except for the final monthly payment).  ROA.303, 326-27.  The parties then renewed the contract, and Golf Channel performed under the renewed contract for the first two months but Stanford did not.  ROA.304, 312-13.

It undisputed that Golf Channel acted in good faith and had no knowledge of Stanford's insolvency or fraudulent activities until after Stanford began missing payments and was placed into receivership.  ROA.304, 6496-97.  Golf Channel has filed claims with the Receiver for Stanford's last monthly payment under the original contract and for breach of the renewal contract.  ROA.304.  Under the panel's decision, however, Golf Channel must now disgorge and repay the entire $5.9 million it received from Stanford under its valid and fully-performed contract.

## ARGUMENT AND AUTHORITIES

## I.     THE PANEL DECISION CONFLICTS WITH *BROWN*.

The panel decision cannot be reconciled with *Brown*.  Both cases addressed the same issue:  whether parties to whom Stanford paid money have a defense to a fraudulent transfer claim because the transfers were for "reasonably equivalent

value." Tex. Bus. & Com. Code § 24.009(a). *Brown* held that investors in the Stanford scheme whose contributions were repaid could not be required to disgorge those amounts because they were in exchange for valid debts. *Brown*, 767 F.3d at 443. But the panel in this case held that an innocent merchant that performed a market-value contract in the ordinary course of business must return every cent of consideration because the contract unwittingly furthered Stanford's fraudulent activities and thus was purportedly valueless. *Brown*'s holding governs here and mandates affirmance of the district court. A party to an illegal contract with a Ponzi scheme cannot profit from it. But the statute protects good faith transferees that receive market-rate payments in satisfaction of valid debts.

### A.     Under *Brown* And TUFTA, A Good Faith Transfer Has Value If The Transferee Has A Claim Or Right To Payment.

Under the statute, one who receives a payment in good faith has a valid defense to a fraudulent transfer if that transferee gave something of "reasonably equivalent value" in exchange. Tex. Bus. & Com. Code § 24.009(a). "Value" is given "if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." *Id.* § 24.004(a). A "debt" means a liability on a "claim," which in turn means "a right to payment or property." *Id.* §§ 24.002(3), (5). Thus, the statute unequivocally provides that a good faith transfer is in exchange for value if it satisfies a valid right to payment.

Applying the statutory language, this Court in *Brown* held that investors in the Stanford scheme who received repayments of their investments were entitled to retain those amounts because the repayments were "payments of an antecedent debt"—namely, the investors' fraud claims against Stanford.  767 F.3d at 443. This holding accords with the holdings of other circuits applying the nearly identical language of other state fraudulent transfer statutes and the Bankruptcy Code in the context of Ponzi schemes.  *See*, *e.g.*, *Donnel v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008); *In re Hedged-Inv. Assocs., Inc.*, 84 F.3d 1286, 1289-90 (10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995).

The *Brown* investors, however, were not entitled to retain purported "interest" payments from the fraudulent CDs because those contracts were illegal and unenforceable and payment under those contracts therefore did not satisfy any antecedent debt.  *Brown*, 767 F.3d at 440-41.  This holding comported with this Court's prior decision in *Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006), which disallowed a broker's claim to illegal "commissions" purportedly owed in connection with a Ponzi scheme, "because the investor-defendants have no claim for contractual interest from a Ponzi scheme." *Brown*, 767 F.3d at 442.

Under *Brown* and *Warfield*, the question of value exchange turns on whether the transferee had a preexisting claim, such that payment of that claim satisfies a valid debt owed by the debtor's estate.  *Brown*, 767 F.3d at 440-43.  If payment is

made for a legal and enforceable contract (or, as with the investors' principal, a valid claim for restitution), the payment exchanges "value" by definition. Thus, the Court in *Brown* agreed with the district court in that case that the investors "did give reasonably equivalent value to the extent that they received back their principal because they have actionable claims for fraud and restitution." *Id*. at 441.

Under this holding, the market-rate payments made to Golf Channel under its valid contract, like the investors' principal repayments, were in exchange for value because Golf Channel had an enforceable claim to the payments. There is no argument that Golf Channel's contract was illegal or unenforceable, as were the broker's contract in *Warfield* and the investors' claim to interest in *Brown*.[2] To the contrary, the panel noted that Golf Channel's services "may have been quite valuable to the creditors of a legitimate business" and "are of substantial value" to Golf Channel, and held that Golf Channel remains a valid Stanford creditor that "must wait its turn for a pro rata share of whatever remains in the estate." Slip op. at 8-9 n.8. Yet even though the panel recognized that Golf Channel is a creditor that continues to have a valid (albeit unsecured) claim under its contract, the panel nonetheless held that Golf Channel must return the entire $5.9 million received for

---

[2]     Golf Channel's contract was legal, enforceable, and negotiated at arm's length for market rates. ROA.271, 281-82, 300-08, 310, 317-20, 331, 350, 5958. The Receiver did not allege that the contract is void or unenforceable, and did not dispute that point when Golf Channel asserted it as a key distinction between this case and cases such as *Warfield*. *See* Br. for Appellee 25; *compare* ROA.271, 281-82, 301-08, 5958 *with* ROA.184-99, 375-403, 5481-5502, 5908-18.

its valuable services under that same contract.

That internally inconsistent holding cannot be squared with *Brown* or the plain language of TUFTA. Golf Channel fully performed under its contract. ROA.303-04, 312-13, 326-27. Golf Channel had a "claim"—defined by the statute as a "right to payment," Tex. Bus. & Com. Code § 24.002(3)—for each payment that it received under the contract. The amounts owed under that "claim" constituted "debt," defined as "a liability on a claim," *id*. § 24.002(5). Thus, the payments under that contract had reasonably equivalent "value" under TUFTA because they "satisfied" that "antecedent debt," *id*. § 24.004(a), and because they were indisputably made at market value and received in good faith, *id*. § 24.009(a).

In fact, Golf Channel should have an even stronger entitlement to retain its payments than the investors did to their principal contributions in *Brown*. Whereas the investors had only an inchoate, unadjudicated restitution claim, Golf Channel had a valid, enforceable contract. And whereas the investors invested in something they arguably should have known was too good to be true, Golf Channel had no reason to know of Stanford's fraud. As one commentator has noted, the panel's decision "effectively elevated" the investors "to a higher level of creditors who have a greater chance of recovering transfers" than do "ordinary and innocent merchants, such as … the Golf Channel in this case." Jay Adkisson, *The Fifth Circuit Slices The Golf Channel Into The Pond*, FORBES, March 18, 2015

(*available at* http://onforb.es/1EuSMaU).   This "has the potential to disrupt the normal business expectation of merchants."  *Id.*

### B.     There Is No Ponzi Scheme Exception To The Definition Of Value.

Under *Brown*, a good faith transferee that receives payments in satisfaction of an antecedent debt has a valid defense to a fraudulent transfer claim.  Under the panel's decision, by contrast, the viability of the defense depends on whether the transferor is—unbeknownst to the transferee—engaged in a fraudulent scheme. That holding is inconsistent with both *Brown* and the statute, and would impose unwarranted and unprecedented obligations on good faith merchants to scrutinize the internal affairs of every company with which they deal.

The panel held that because "Ponzi schemes by definition create greater liabilities than assets with each subsequent transaction," Golf Channel's services necessarily provided no value under TUFTA as measured from the creditors' per-spective.  Slip op. 9.  Although the panel agreed that "consumables and speculative investments can have value," it held that "the case before us is different because Stanford was engaged in a Ponzi scheme, not a legitimate enterprise."  *Id*. at 10 n.9.  The panel interpreted *Warfield* as holding that "[b]ecause the debtor's busi-ness was inherently illegitimate, the broker's services, which furthered the scheme, had no value as a matter of law."  *Id*. at 7 (citing *Warfield*, 436 F.3d at 560).[3]

---

[3]     The panel stated that "Golf Channel failed to proffer any evidence showing that its

This analysis cannot be squared with *Brown*. Neither *Brown* nor *Warfield* turned simply on whether the exchange furthered the Ponzi scheme. If the test of value were only whether services rendered in exchange for a transfer "furthered" an "inherently illegitimate" scheme, the investors in *Brown* could not have retained their principal repayments, because no exchange more directly furthers a Ponzi scheme than another investment. Each new investment perpetuated and extended the Stanford Ponzi scheme. In the panel's words, it ***"decreased*** the value of the estate by creating a new liability that the insolvent business could never legitimately repay." Slip op. 9 (emphasis in original). Nonetheless, the principal repayments were valid, and not subject to disgorgement, because they compensated for a lawful debt. In contrast, the interest payments were ***not*** valid, and ***were*** subject to disgorgement, because, like the commissions for the purported broker services in *Warfield*, they were made pursuant to illegal contracts.

The panel's singular focus on the nature of Stanford's activities also finds no support in the language of the statute. The panel's holding correctly notes that "TUFTA makes no distinction between different types of services or different types of transferees," yet it concludes from this fact that "[w]e have no authority to

---

advertising services provided equally equivalent value from the standpoint of Stanford's creditors … ." Slip op. 1. The panel's decision, however, turned on its legal conclusion that the services lacked any value "as a matter of law." *See id*. at 8. The Panel acknowledged that Golf Channel provided evidence of the market value of its services. *Id*. Its conclusion that the services had no value was one of law, not of fact. *Cf. id*. at 6 n.4 (noting that if there is some value, whether that value is reasonably equivalent to transfer is reviewed for clear error).

create an exception for 'trade creditors.'" Slip op. 9. In fact, Golf Channel does not seek any exception, but rather seeks to be treated on equal terms with investors or any other good faith transferee. By definition, the fact that Golf Channel was paid under a valid "claim" satisfies any burden to show "value." *See supra* at 7.

The panel relied on a comment to the Uniform Fraudulent Transfer Act ("UFTA") stating that courts should determine value "in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. *Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition.*" Slip op. 7 (quoting UFTA § 3, cmt 2) (emphasis the Court's). There are two problems with that reliance. First, neither the TUFTA statute nor the UFTA comment differentiates between different types of good faith transferees. Yet, if the current holding in this case remains in effect, this Circuit's fraudulent transfer jurisprudence will favor investors (who retain their repayment of principal under *Brown*) at the expense of all other innocent, good faith creditors who happen to conduct ordinary business with a Ponzi scheme (who must now disgorge all payments). Second, even assuming *arguendo* that the analysis should be done solely "from a creditor's viewpoint" despite the absence of any such directive in the statutory text, the payments to Golf Channel ***did not*** improperly deplete the Stanford estate, whether measured from the perspective of creditors or anyone else. The payments to Golf Channel directly offset a valid,

$5.9 million contractual obligation that would otherwise be a debt of the estate. That constituted value as expressly defined by TUFTA. *See supra* at 7.

Not only is the panel's ruling inconsistent with *Brown*, but its interpretation of value has no apparent limiting principle, as the nature of a Ponzi scheme ensures that virtually any service rendered will in some way further the scheme. To the extent Golf Channel's air time was used by Stanford to further its Ponzi scheme, so too were investment principal, electricity, gas, water, Internet, leased building space, telephone service, office supplies, professional services, mail room staff labor, and any other consumable good or service purchased by Stanford from vendors or trade creditors in the ordinary course of business. All these merchants, as well as innocent employees such as administrative personnel, are in danger of having their lawful consideration or wages disgorged years after they were paid.

Indeed, it is difficult to conceive of any transaction, outside of a physical asset that remains when a receiver or trustee is appointed, that would meet the panel's definition of value. The panel stated that "one can imagine an electricity provider putting on evidence that its services helped preserve the building in which the debtor operated, preventing the building's deterioration to the benefit of the debtor's creditors." Slip op. 8 n.7. But that speculation only underscores the unprecedented breadth of the ruling. Businesses, including fraudulent operators like Stanford, use electricity and other services primarily to further their business

11

activities (for example, by operating computers and lighting the workplace) rather than to preserve physical assets. Thus, unless a merchant could make the kind of extraordinary (and unlikely) showing hypothesized by the panel, its consideration would be invalid and subject to disgorgement.

As the Eleventh Circuit has recognized, such a rule threatens legitimate transactions. In *In re Financial Federated Title & Trust*, 309 F.3d 1325, 1332 (11th Cir. 2002), the court rejected the view—now adopted by the panel in this case—that any services that further a Ponzi scheme and deepen its insolvency are necessarily without value. The court endorsed an earlier court's reasoning that

> [t]he fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value. By definition, a Ponzi scheme is driven further into insolvency with each transaction. Therefore, by the trustee's reasoning, no one who in any way dealt with, worked for, or provided services to the debtors could prevent avoidance of any transfers they received. The debtors' landlord, salaried employees, accountants and attorneys, and utility companies that provided services to the debtors all assisted the debtors in the furtherance of their fraudulent scheme. In spite of this fact, we do not think that the goods and services that these persons and entities provided were without value or that transfers to them could be set aside as fraudulent conveyances.

*Id.* (quoting *In re Universal Clearing House Co.,* 60 B.R. 985 (D. Utah 1986)).

Rehearing is thus warranted given the clear conflict between *Brown* and the panel's decision, and decisions of other Circuits, on a question of importance to all good faith merchants doing business in this Circuit. *See* Fed. R. App. P. 35(a).

## II. THIS CASE INVOLVES AN ISSUE OF EXCEPTIONAL IMPORTANCE THAT THREATENS LEGITIMATE COMMERCIAL TRANSACTIONS IN THIS CIRCUIT AND ELSEWHERE.

The panel's decision is unprecedented. Neither party has identified a single other fraudulent transfer decision that voided payments to a merchant conducting its ordinary business in good faith merely because its goods or services unwittingly furthered a Ponzi scheme. In fact, Golf Channel has identified no other case where a trustee or receiver even brought such an action. And the panel's decision, if not corrected, threatens to chill a wide range of legitimate commercial transactions.

The district court in this case correctly recognized the significant negative consequences for legitimate merchants that would result from the rule eventually adopted by the panel:

> [T]he Receiver's position would shift the risk of loss, and the corresponding duty to investigate, from investors and brokers to trade creditors. It is impractical to expect trade creditors to conduct a forensic investigation into the business of all their customers in the ordinary course of business. On the other hand, investors (or their advisors) should assess the risk of their investment and the corresponding potential reward as a matter of course.

ROA.6504.

As a result of the panel's decision, legitimate merchants will run the risk of losing their entire consideration—years after the fact—if they unknowingly deal with an enterprise that is conducting a fraudulent scheme. Merchants, particularly those with contracts of significant value, will be required either to conduct audits

13

of all their customers or curtail their dealings. Either way, legitimate transactions and efficient economic activity will suffer. This is precisely what the good faith transferee exception of TUFTA and similar laws seek to avoid. Indeed, as the district court noted, if this kind of risk and vetting obligation should be imposed on anyone, it should have been on the investors, not innocent merchants. *Id.*

The issue, moreover, has widespread impact. The Stanford Ponzi scheme was "one of the largest in U.S. history," *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 699 F.3d 848, 851 n.1 (5th. Cir. 2012), and the panel's decision "affects more than $40 million in claims" brought by the receiver in other actions. John Council, *Golf Channel Bogeys Attempt to Keep Millions Received From R. Allen Stanford*, TEXAS LAWYER, March 17, 2015 (*available at* www.texaslawyer.com/id=1202720813058/Golf-Channel-Bogeys-Attempt-to-Keep-Millions-Received-From-R-Allen-Stanford?mcode=1202615604418& slreturn=20150217155805). And the impact is not just limited to the Stanford cases. As noted, it will potentially affect a wide range of legitimate transactions conducted in this Circuit.

## III. THE COURT SHOULD AFFIRM THE JUDGMENT BUT MAY ALSO CERTIFY THE QUESTION TO THE TEXAS SUPREME COURT.

For the foregoing reasons, the Court should grant rehearing, vacate the panel opinion, and affirm the district court's judgment. But in the alternative, the Court,

upon rehearing, could withdraw the panel opinion and exercise its discretion to certify a controlling question of law to the Texas Supreme Court.  Although Golf Channel believes that both the governing statute and *Brown* are clear and require affirmance, certification would also be appropriate under Tex. R. App. P. 58.1

The Court employed a similar procedure in *Austin v. Kroger Texas L.P.*, 746 F.3d 191 (5th Cir. 2014).  There, the appellee sought rehearing en banc from a panel decision and also sought certification for the first time.  The panel then withdrew its prior opinion and certified a controlling question to the Texas Supreme Court in light of an "arguable conflict" between two different lines of intermediate state appellate court authority.  *Id.* at 204.  Certification would similarly be appropriate in this case given the conflicting panel decisions and the lack of any Texas case law—much less a controlling Texas Supreme Court decision, *see* Tex. R. App. P. 58.1—interpreting TUFTA's definition of "value" in the context of a good faith transferee of a Ponzi scheme.

## CONCLUSION

The Court should grant rehearing en banc and either affirm the district court's judgment or certify the question to the Texas Supreme Court.

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-0466

Respectfully submitted,

/s/ Theodore W. Daniel
Theodore W. Daniel
Kyle M. Schindler
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas  75201
(214) 855-8000

Katherine D. Mackillop
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095
(713) 651-5151

March 25, 2015

Counsel for Appellees

## CERTIFICATE OF SERVICE

I certify that on March 25, 2015 a copy of this document was filed using the U.S. Court of Appeals for the Fifth Circuit's ECF/CM system and all counsel of record listed below were served using the court's electronic Notice of Docket Activity pursuant to 5th Cir. R. 25.2.5.

Douglas J. Buncher               Kevin M. Sadler
Negligan Foley, LLP              Baker Botts L.L.P.
325 N. St. Paul, Suite 3600      98 San Jacinto Blvd., Suite 1500
Dallas Texas 75201               Austin, Texas 78701


                                 /s/  Theodore W. Daniel
                                 Theodore W. Daniel

17

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
March 11, 2015

Lyle W. Cayce
Clerk

———————

No. 13-11305

———————

RALPH S. JANVEY, In His Capacity as Court Appointed Receiver for the
Stanford International Bank Limited, et al; OFFICIAL STANFORD
INVESTORS COMMITTEE,

> Plaintiffs – Appellants,

v.

THE GOLF CHANNEL, INCORPORATED; Golf Channel, L.L.C., doing
business as Golf Channel,

> Defendants – Appellees.

———————

Appeal from the United States District Court
for the Northern District of Texas

———————

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case requires us to interpret and apply the Texas Uniform
Fraudulent Transfer Act (TUFTA) to determine whether the court-appointed
receiver of a failed Ponzi scheme can recover nearly six million dollars that the
scheme spent advertising on a major cable network.  Because Golf Channel
failed to proffer any evidence showing that its advertising services provided
reasonably equivalent value from the standpoint of Stanford's creditors, and
we have previously held that services furthering a debtor's Ponzi scheme

provide no value to the debtor's creditors, we REVERSE the district court's judgment and RENDER judgment in favor of the receiver.

## I.

The facts are undisputed. For nearly two decades, Stanford International Bank, Limited (Stanford) operated a multi-billion dollar Ponzi scheme[1] through more than 130 affiliated entities.[2] To sustain the scheme, Stanford promised investors exceptionally high rates of return on certificates of deposit (CD), and sold these investments through advisors employed at the affiliated entities. Some early investors received the promised returns, but, as was later discovered, these returns were merely other investors' principal. Before collapsing, Stanford had raised over $7 billion selling these fraudulent CDs.

Beginning in 2005, Stanford developed a plan to increase awareness of its brand among sports audiences. It targeted this group because of its large proportion of high-net-worth individuals, the people most likely to invest with Stanford. Stanford became a title sponsor of the Stanford St. Jude's Championship, an annual PGA Tour event held in Memphis, Tennessee. Upon hearing of Stanford's sponsorship, The Golf Channel, Inc., which broadcasted the tournament, offered Stanford an advertising package to augment its marketing efforts. In October 2006, Stanford entered into a two-year

---

[1] "'A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses.'" *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188 n.1 (5th Cir. 2013) (quoting *Eberhard v. Marcu*, 530 F.3d 122, 132 n. 7 (2d Cir. 2008).

[2] Stanford marketed itself as the "Stanford Financial Group" and sometimes entered into contracts through an affiliate, the Stanford Foundation. Given the large number of affiliated entities, for simplicity, we use "Stanford" throughout this opinion to refer to the whole enterprise.

agreement with Golf Channel for a range of marketing services including but not limited to: commercial airtime (682 commercials per year); live coverage of the Stanford St. Jude's Championship with interspersed messaging regarding Stanford's charitable contributions, products, and brand; display of the Stanford Logo throughout the event; promotion of Stanford as the sponsor of tournament-update segments that included video highlights every half-hour; and identification of Stanford as a sponsor of Golf Channel's coverage of the U.S. Open (one of the four major annual golf tournaments in the world). Golf Channel did not design Stanford's media strategy or develop the content of the advertisements. However, the agreement required Golf Channel's final approval. Stanford satisfied most of its monthly payment obligations to Golf Channel and, before the agreement expired, entered into a four-year renewal. By the time this lawsuit was initiated, Stanford had paid at least $5.9 million to Golf Channel pursuant to the agreement.

In February 2009, the SEC uncovered Stanford's Ponzi scheme and filed a lawsuit in the Northern District of Texas against Stanford and related entities requesting the district court to appoint a receiver over Stanford. The district court assumed exclusive jurisdiction, seized Stanford's assets, and appointed Ralph S. Janvey to serve as receiver. Pursuant to his powers, the receiver took custody of any and all assets owned by or traceable to the receivership estate, which included recovering any voidable transfers made by Stanford before going into receivership.

In the process of investigating Stanford's accounts, the receiver discovered the payments to Golf Channel, and in 2011, filed suit under TUFTA to recover the full $5.9 million. After initial discovery, the parties filed cross-motions for summary judgment. Despite the fact that Golf Channel offered no evidence to show how its services benefitted Stanford's creditors, the district

No. 13-11305

court granted Golf Channel's motion and denied the receiver's motion.  The district court determined that although Stanford's payments to Golf Channel were fraudulent transfers under TUFTA, Golf Channel was entitled to judgment as a matter of law on its affirmative defense that it received the payments in good faith and in exchange for reasonably equivalent value (the market value of advertising on The Golf Channel).  As the district court explained, "Golf Channel looks more like an innocent trade creditor than a salesman perpetrating and extending the Stanford Ponzi scheme."

## II.

We review a grant of summary judgment *de novo*, "applying the same standard on appeal that is applied by the district court." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (internal quotation marks omitted).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  Because both parties filed motions for summary judgment, we evaluate each party's motion independently and view the evidence in the light most favorable to the nonmoving party.  *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## III.

Fraudulent transfer laws like TUFTA[3] were enacted to protect creditors against depletion of the debtor's estate.  *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007).  To that end, TUFTA allows creditors to void

---

[3] TUFTA, rather than another state's codification of the Uniform Fraudulent Transfer Act (UFTA), governs this dispute.  *See* Tex. Bus. & Com. Code §§ 24.001–24.013.  Before the district court, the parties argued whether Texas's or Florida's version of UFTA applied, but conceded before our court that it is a nonissue given that Texas and Florida have enacted nearly identical UFTA provisions.  *See Stewart v. United States*, 512 F.2d 269, 272 n.10 (5th Cir. 1975) ("[N]o choice of law problem [is] present" where two states' laws "are essentially identical.").  In such a scenario, the forum state's substantive law should apply.  *See Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002).

No. 13-11305

fraudulent transfers made by a debtor and force the transferee to return the transfer to the debtor's estate. Tex. Bus. & Com. Code § 24.008. A transfer is fraudulent if made "with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 24.005(a)(1). "In this circuit, proving that [a debtor/transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014) (quoting *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011)); *accord Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)).

However, TUFTA provides an affirmative defense that transferees may use to prevent creditors from voiding transfers. Even where a transfer is fraudulent under TUFTA, a creditor cannot void the transfer if the transferee proves two elements: (1) that it took the transfer in good faith; and (2) that, in return for the transfer, it gave the debtor something of "reasonably equivalent value." Bus. & Com. § 24.009(a).

Given the undisputed fact that Stanford was engaged in a Ponzi scheme, the parties stipulated that the $5.9 million dollar transfer to Golf Channel was fraudulent. *See Brown,* 767 F.3d at 439. In addition, the district court held, and the receiver did not challenge on appeal, that Golf Channel took the transfer in good faith. Therefore, at issue here is whether Golf Channel has proven the second element of its affirmative defense—that its advertising services provided "reasonably equivalent value" as defined under TUFTA.

We analyze reasonably equivalent value under a two-step framework. First, we review *de novo* whether the property or service exchanged categorically had any value under TUFTA, as this is a question of law. *See, e.g.*, *Warfield*, 436 F.3d at 558 (holding that broker services furthering a Ponzi scheme have no value as a matter of law) *accord In re Fruehauf Trailer Corp.*,

No. 13-11305

444 F.3d 203, 212–13 (3d Cir. 2006) ("[A] court should *not* consider the 'totality of the circumstances' in evaluating the threshold question of whether any value was received at all.") (emphasis in original).   Because we hold that Golf Channel failed to prove that it exchanged something of value, we need not address the second step.[4]

"Value" is defined in TUFTA as "property []transferred or an antecedent debt []secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."   Tex. Bus. & Com. Code § 24.004(a).   We must make an "Erie guess" as to how Texas would interpret this definition of "value" in TUFTA.   *See Warfield*, 436 F.3d at 558 (citing *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 406 (5th Cir. 2004)).   TUFTA itself instructs us to apply and construe its provisions so as "to effectuate [UFTA's] general purpose to make uniform the law with respect to the subject of [UFTA] among states enacting it."   Tex. Bus. & Com. Code § 24.012.   To that end, we may consider the comments to UFTA, authorities interpreting other states' UFTA provisions, and interpretations of section 548 of the Bankruptcy Code (upon which UFTA's definition of value is based).   *Nathan v. Whittington*, 408 S.W.3d 870, 873–74 (Tex. 2013); *First Nat. Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86 (Tex. 2003); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000); *see also Bowman v. El Paso CGP Co., L.L.C.*, 431 S.W.3d 781, 786 n.6 (Tex. App.— Houston [14th Dist.] 2014, pet. filed) (explaining the persuasiveness of these sources).

The relevant comment in UFTA states that the definition of "value" is:

---

[4] If there is some value, we review for clear error whether the value exchanged is reasonably equivalent to the value of the transfer.   *Matter of Dunham*, 110 F.3d 286, 289 (5th Cir. 1997) (abrogating *Butler Aviation Int'l, Inc. v. Whyte (Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125 (5th Cir. 1993)).

> [A]dapted from § 548(d)(2)(A) of the Bankruptcy Code. . . . The
> definition []is not exclusive [and] is to be determined in light of the
> purpose of the Act to protect a debtor's estate from being depleted
> to the prejudice of the debtor's unsecured creditors. *Consideration
> having no utility from a creditor's viewpoint does not satisfy the
> statutory definition.*

Unif. Fraudulent Transfer Act § 3 cmt. 2 (emphasis added). UFTA offers only
one specific example of an exchanged benefit that fails the value test—love and
affection. *See id.* (citing *United States v. West*, 299 F. Supp. 661, 666 (D. Del.
1969)). Therefore, courts are left to define the contours of "value" and "[t]he
primary consideration . . . is the degree to which the transferor's net worth is
preserved." *Warfield*, 436 F.3d at 558 (citing *Butler Aviation Int'l, Inc. v. Whyte
(Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993)).[5]
Importantly, we measure value "from the standpoint of the creditors," not from
that of a buyer in the marketplace. *Stanley v. U.S. Bank Nat'l Assoc. (In re
TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (citing *In re Hinsley*,
201 F.3d 638, 644 (5th Cir. 2000)).

In *Warfield*, we held that commissions paid to a broker in exchange for
securing new investments into a Ponzi scheme are voidable, even assuming the
broker was unaware of the fraud. 436 F.3d at 560. Because the debtor's
business was inherently illegitimate (a Ponzi scheme), the broker's services,
which furthered the scheme, had no value as a matter of law.[6] *Id.* It made no

---

[5] In *Warfield*, we interpreted and applied Washington's UFTA provisions, which, in
relevant part, are identical to the TUFTA provisions at issue in this case. *Compare* Tex. Bus.
& Com. Code § 24.009(a), .004(a) *with* Wash. Rev. Code § 19.40.081(a), .031(a). Both states'
provisions are codifications of sections 8 and 3 of the Uniform Fraudulent Transfer Act. They
include identically worded affirmative defenses for transferees and identically worded
definitions of "value."

[6] This conclusion is consistent with our circuit precedent and other circuits that have
considered the meaning of "value" in UFTA and section 548 of the Bankruptcy Code in the
context of a debtor engaged in a Ponzi scheme. *See Brown,* 767 F.3d at 441 (holding that
because a contract promising returns on investment in a Ponzi scheme is void, payment of

No. 13-11305

difference whether those same broker services would have been valuable to legitimate businesses in the marketplace.

On summary judgment in the instant case, Golf Channel put forward no evidence that its services preserved the value of Stanford's estate or had any utility from the creditors' perspective.[7]  Golf Channel only brought forth evidence showing the *market* value of its services.  This was insufficient to satisfy its burden under TUFTA of proving value *to the creditors*.  *See* Unif. Fraudulent Transfer Act § 8 cmt. 1 ("The person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged.").

Moreover, Golf Channel's services did not, as a matter of law, provide any value to Stanford's creditors.  Just like the broker's (unknowing) efforts to extend the Ponzi scheme in *Warfield*, Golf Channel's (unknowing) efforts to extend Stanford's scheme had no value to the creditors.  While Golf Channel's services may have been quite valuable to the creditors of a legitimate business,

---

such returns does not reduce an antecedent contractual debt or compensate an investor for the time value of his money); *Donell v. Kowell*, 533 F.3d 762, 777–78 (9th Cir. 2008) (reasoning that interest payments to an investor in a Ponzi scheme "are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business" and do not compensate for the time value of money); *Scholes v. Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995) (holding that the time value of money that is invested in a Ponzi scheme has no value); *SEC v. Harris*, No. 3:09-CV-1809-B, 2010 WL 3719318, at * 2 (N.D. Tex. 2010) (holding that the goodwill received from promotional materials that a charity purchased in exchange for a donation from the Ponzi scheme had no value) *rev'd on other grounds*, *Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 528–29 (5th Cir. 2012); *Ramirez v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) (holding that the time value of money invested in a Ponzi scheme is not an exchange of value); *In re Indep. Clearing House Co.*, 77 B.R. 843, 859 (D. Utah 1987) (same).

[7] Such evidence might exist even in the context of a debtor engaged in a Ponzi scheme. Hypothetically, one can imagine an electricity provider putting on evidence that its services helped preserve the building in which the debtor operated, preventing the building's deterioration to the benefit of the debtors' creditors.  But here, Golf Channel has not put forth any evidence that its advertising services accrued any benefit to Stanford's creditors.

they have no value to the creditors of a Ponzi scheme.[8]  Ponzi schemes by definition create greater liabilities than assets with each subsequent transaction.  Each new investment in the Stanford Ponzi scheme *decreased* the value of the estate by creating a new liability that the insolvent business could never legitimately repay.  *See Brown*, 767 F.3d at 439 (describing the insolvency of Stanford's Ponzi scheme); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("[A] Ponzi scheme is, as a matter of law, insolvent from its inception." (internal quotation marks omitted));  *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) ("The effect of such a scheme is to put the corporation farther and farther into debt . . . .").  Services rendered to encourage investment in such a scheme do not provide value to the creditors.

Golf Channel argues that its advertising services did not further the Stanford Ponzi scheme and that the $5.9 million reasonably represents the market value of those services.  It tries to distinguish its services from the broker services in *Warfield* on the ground that a broker directly secures new investment in to a Ponzi scheme, whereas an advertiser is an innocent "trade creditor" generally promoting a business's brand.  This distinction has no significance under TUFTA.  TUFTA makes no distinction between different types of services or different types of transferees, but requires us to look at the value of any services from the creditors' perspective.  We have no authority to create an exception for "trade creditors."  *See Truong v. Bank of Am., N.A.*, 717 F.3d 377, 387 (5th Cir. 2013) (refusing to recognize a statutory exception on

---

[8] Without any authority, Golf Channel argues that its own status as a creditor requires that we resolve this case in its favor.  From its perspective, the advertising services are of substantial value.  However, Golf Channel is not the only creditor we must consider.  It is one among many who have unsecured claims, and must wait its turn for a pro rata share of whatever remains in the Stanford estate.

No. 13-11305

the basis of policy concerns or the wisdom of the legislature in adopting a Louisiana statute).

We note that our conclusion here does not rest upon a conclusion that the advertising services themselves lacked value in the abstract. In granting Golf Channel's motion for summary judgment, the district court compared Golf Channel's services to consumables and speculative investments which have been held to have value under UFTA. The district court stated that "[i]t seems wrong . . . to hold that every transaction in which a debtor acquires consumables is a fraudulent transfer." We agree. As the district court explained, we have held that a debtor purchasing jet fuel to keep an affiliated airline in business is an exchange for reasonably equivalent value even though the value to the debtor is merely the potential proceeds of a possible sale of that affiliated airline.[9] *Matter of Fairchild*, 6 F.3d at 1123–27 (interpreting "value" in section 548 of the Bankruptcy Code). In fact, the investment in *Fairchild* was ultimately unsuccessful, yet, when measured at the time of the investment, we held that the increased possibility of selling the business had value. *Id.* at 1126–27. We explicitly rejected a definition of value that would exclude speculative or potential gains. *Id.* Here, however, the advertising

———————————

[9] Similarly, the Fourth Circuit held that ownership in a company whose only asset was a 1 in 22 chance of winning a cellular license in an FCC lottery had value. *See Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns NC, Inc.)*, 914 F.2d 458, 466, 474–75 (4th Cir. 1990) (interpreting "value" in section 548 of the Bankruptcy Code). And the Third Circuit has held that a commitment letter that had only a small chance of maturing into financing had value. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 152–53 (3d Cir. 1996). In addition, the Sixth Circuit has held that the chance of winning on a bet in a casino had value. *In re Chomakos*, 69 F.3d 769, 770–71 (6th Cir. 1995). We agree with the district court and Golf Channel that consummables and speculative investments can have value. But the case before us is different because Stanford was engaged in a Ponzi scheme, not a legitimate enterprise. The issue is not whether Golf Channel's services have value in the abstract, but whether they provided reasonably equivalent value to Stanford's creditors.

No. 13-11305

services did not provide even a speculative economic benefit to Stanford's creditors.

## IV.

Accordingly, we REVERSE the district court's judgment and RENDER judgment in favor of the receiver.

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 11, 2015

Lyle W. Cayce
Clerk

_____

No. 13-11305

_____

D.C. Docket No. 3:11-CV-294

RALPH S. JANVEY, In His Capacity as Court Appointed Receiver for the
Stanford International Bank Limited, et al; OFFICIAL STANFORD
INVESTORS COMMITTEE,

      Plaintiffs - Appellants

v.

THE GOLF CHANNEL, INCORPORATED; TGC, L.L.C., doing business as
Golf Channel,

      Defendants - Appellees

Appeal from the United States District Court for the
Northern District of Texas, Dallas

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

It is ordered and adjudged that the judgment of the District Court is
reversed and judgment is rendered in favor of the receiver.

IT IS FURTHER ORDERED that each party to bear its own costs on
appeal.