# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 15-0489

═══════════════

RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE
STANFORD INTERNATIONAL BANK, LIMITED, ET AL.; OFFICIAL STANFORD
INVESTORS COMMITTEE, APPELLANTS,

v.

THE GOLF CHANNEL, INCORPORATED; TGC, L.L.C., DOING BUSINESS AS GOLF
CHANNEL, APPELLEES

════════════════════════════════════════════

ON CERTIFIED QUESTION FROM THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

════════════════════════════════════════════

**Argued January 12, 2016**

JUSTICE GUZMAN delivered the opinion of the Court.

Under the Texas Uniform Fraudulent Transfer Act (TUFTA), an asset transferred with "actual intent to hinder, delay, or defraud" a creditor may be reclaimed for the benefit of the transferor's creditors unless the transferee "took [the asset] in good faith and for a reasonably equivalent value."[1] Even without proof of actual intent, an asset transfer may be avoided if the transferor was financially vulnerable at the time of the transaction and the "value" exchanged was not reasonably equivalent.[2] In this fraudulent-transfer clawback action, the asset at stake is $5.9 million a cable television network received in exchange for media-advertising services that

---

[1] TEX. BUS. & COM. CODE §§ 24.005(a)(1), .009(a).

[2] *Id.* §§ 24.005(a)(2), .006(a).

included commercial air time and sponsorship recognition during sports broadcasts.  The issue in

this certified-question proceeding is whether the television network must relinquish its compensation

absent proof the transaction benefited the transferor's creditors.  The question arises not because the

exchange at issue lacked objective value but because the transferor turned out to be one of the most

notorious Ponzi schemes of the modern era.[3]

    With few exceptions, courts applying similar fraudulent-transfer statutes conclusively

presume actual intent and insolvency when a transfer is made in furtherance of a Ponzi scheme,[4] and

some courts have held that satisfaction of the "reasonably equivalent value" requirement depends

on the extent to which the transaction preserved the transferor's net worth for the benefit of its

creditors.[5]  Because a Ponzi scheme is a fraudulent endeavor that is driven further into insolvency

---

[3] "Generically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors."  *In re Bonham*, 229 F.3d 750, 759 n.1 (9th Cir. 2000).

[4] *See, e.g.*, *Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015) ("[B]ecause Ponzi schemes are insolvent by definition, we presume that transfers from such entities involve actual intent to defraud."); *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014) (under TUFTA, "existence of the Ponzi scheme establishes fraudulent intent"); *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) ("proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud" under Florida Uniform Fraudulent Transfer Act); *Wing v. Dockstader*, 482 F. App'x 361, 363 (10th Cir. 2012) ("Under the [Uniform Fraudulent Transfer Act], once it is established that a debtor acted as a Ponzi scheme, all transfers by that entity are presumed fraudulent."); *Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." (internal quotation and alteration omitted)); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (proof of a Ponzi scheme establishes fraudulent intent and insolvency as a matter of law); *cf. Ritchie Capital Mgmt., LLC, v. Stoebner*, 779 F.3d 857, 862 (8th Cir. 2015) (declining to opine on the validity or applicability of the Ponzi-scheme presumption in the Eighth Circuit because actual fraudulent intent was established under statutory "badges of fraud" approach).  *But see Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) (declining to apply Ponzi-scheme presumptions in favor of case-specific inquiries under the Minnesota Uniform Fraudulent Transfer Act).

[5] *See, e.g.*, *Warfield*, 436 F.3d at 560 ("The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved.").

with each transaction,[6] under this authority, unknowing vendors and service providers have little defense to fraudulent-transfer claims unless the challenged transaction has the potential to generate or preserve a tangible or leviable asset for the transferor's creditors. For consumable goods and services, disgorgement of compensation becomes a veritable certainty without regard to the transferee's good faith or the objective value of the consideration the transferee provided.

Following prior precedent applying similar principles, the Fifth Circuit initially ordered the television network to return all remuneration paid for services rendered, holding that media-advertising services have "no value" to a Ponzi scheme's creditors even though the same services might be "quite valuable" to the creditors of a legitimate business.[7] On rehearing, the Circuit vacated its opinion. Observing that TUFTA, unlike the model Uniform Fraudulent Transfer Act (UFTA), specially defines the term "reasonably equivalent value" to include consideration having value from a marketplace perspective,[8] the Circuit certified the following question to this Court:

> Considering the definition of "value" in section 24.004(a) of [TUFTA], the definition of "reasonably equivalent value" in section 24.004(d) of [TUFTA], and the comment in [UFTA] stating that "value" is measured "from a creditor's viewpoint," what showing of "value" under TUFTA is sufficient for a transferee to prove the elements of the [good-faith] affirmative defense under section 24.009(a) of [TUFTA]?[9]

---

[6] *See, e.g., id.* at 558 (stating "a Ponzi scheme . . . is, as a matter of law, insolvent from its inception," citing *Cunningham v. Brown*, 265 U.S. 1, 7 (1924), in which the Supreme Court recounted evidence showing that the eponymous Ponzi-scheme operator, Charles Ponzi, "was always insolvent, and became daily more so, the more his business succeeded" and never made "investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes").

[7] *Janvey v. Golf Channel*, 780 F.3d 641, 646-47 (5th Cir.), *vacated by* 792 F.3d 539 (5th Cir. 2015) (per curiam) (*Golf Channel I*).

[8] *See* TEX. BUS. & COM. CODE § 24.004(d).

[9] *Janvey v. Golf Channel, Inc.*, 792 F.3d 539, 547 (5th Cir. 2015) (per curiam) (*Golf Channel II*); *see also* TEX. CONST. art. 5, § 3-C(a); TEX. R. APP. P. 58.1.

Construing the relevant statutory provisions, we conclude TUFTA's "reasonably equivalent value" requirement can be satisfied with evidence that the transferee (1) fully performed under a lawful, arm's-length contract for fair market value, (2) provided consideration that had objective value at the time of the transaction, and (3) made the exchange in the ordinary course of the transferee's business.

## I. Background

For nearly two decades, R. Allen Stanford perpetrated a multi-billion dollar Ponzi scheme through Antigua-based Stanford International Bank Limited (Stanford), which sold fraudulent high-yield certificates of deposit to unwary investors.[10]  To further the scheme, Stanford used new investors' principal to pay early investors their promised returns, a classic Ponzi-scheme artifice designed to create a false aura of success.[11]  By the time the Securities and Exchange Commission uncovered the ruse in 2009, Stanford had bilked investors out of more than $7 billion.[12]

After Stanford's assets were seized and placed into receivership, the court-appointed receiver instituted legal proceedings to void asset transfers Stanford made before entering receivership, including suits to recoup payments to various vendors.  At issue in this certified-question proceeding

---

[10] The Ponzi scheme operated through a complicated network of more than 130 entities affiliated with Stanford. *Golf Channel I*, 780 F.3d at 642.  The Fifth Circuit referred to the entire enterprise as "Stanford" for simplicity, and we do the same.  *Id.* at 642 n.2.

[11] *See, e.g.*, *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188 n.1 (5th Cir. 2013) (describing a typical Ponzi scheme).

[12] The details of the Stanford Ponzi scheme are well known and recounted at greater length in the opinion affirming R. Allen Stanford's criminal conviction and 110-year prison sentence. *See generally U.S. v. Stanford*, 805 F.3d 557 (5th Cir. 2015).

4

are payments Stanford made to The Golf Channel, Inc. under a contract for media-advertising services.  The relevant facts, recounted below, are undisputed.

In 2005, Stanford initiated a marketing plan targeting new investors in the economic echelon most coveted by the Ponzi scheme, high-net-worth individuals.  Part of Stanford's strategy involved marketing directed at sporting events that skewed favorably to the desired demographic.  Among other activities, Stanford became the title sponsor of the Stanford St. Jude Championship, a 2006 Professional Golfers' Association of America (PGA) event broadcasted and covered by Golf Channel.

The same year, Golf Channel entered into a two-year agreement with Stanford to provide media-advertising services to augment Stanford's existing tournament sponsorships.  Those services were directed at brand awareness and included commercial air time, recognition of Stanford's St. Jude Championship and U.S. Open title sponsorships, and integration of messaging about Stanford's charitable contributions, products, and brand during live tournament coverage.  In exchange for its services, Golf Channel received payments from Stanford each month of the two-year contract term, except for the last monthly payment, which Stanford failed to make.  All told, Stanford paid Golf Channel $5.9 million under the media-services contract, which Golf Channel fully performed.  Three years after the services contract expired, the court-appointed receiver and the Official Stanford Investors' Committee (collectively, the Receiver) sued Golf Channel in federal district court to recover all the money Stanford paid under the media-advertising agreement, alleging the payments were made with intent to defraud Stanford's creditors.

On cross-motions for summary judgment in the federal-court proceeding, the Receiver asserted fraudulent intent was established as a matter of law, while Golf Channel argued the transfer was not voidable because it took Stanford's contract payments in good faith and in exchange for reasonably equivalent value.[13] According to the Receiver, Golf Channel's affirmative defense failed as a matter of law because advertising services that further a Ponzi scheme and produce no tangible estate asset have zero value from the perspective of the enterprise's creditors.[14]

The district court agreed fraudulent intent was conclusively established because Stanford operated a Ponzi scheme, but granted summary judgment for Golf Channel on its affirmative defense. Citing TUFTA's definition of "reasonably equivalent value," the court opined that, if Golf Channel's services provided any "value," the exchange of value was reasonably equivalent because the transaction was arm's length, in good faith, at fair market value, and in the ordinary course of business.[15] As to the threshold issue of value, the court similarly resolved that matter in Golf Channel's favor.

In doing so, the district court rejected the Receiver's argument that there is no "value" unless the transaction leaves the transferor's estate with a tangible asset on which creditors can levy execution. Because value is determined at the time of the transaction, the court explained that transferring consumable goods and services can confer value even though nothing is ultimately left

---

[13] *See* TEX. BUS. & COM. CODE §§ 24.005(a)(1), .009(a).

[14] *See* UNIF. FRAUDULENT TRANSFER ACT § 3, cmt. 2, 7A pt. II U.L.A. 48 (2006) ("Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition [of value].").

[15] *See* TEX. BUS. & COM. CODE § 24.004(d) ("'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction.").

behind for creditors.  A contrary rule, the court observed, would sweep too broadly, negating the good-faith defense for vendors such as the electric and water companies that serviced Stanford's facilities.  Because Golf Channel's advertising time and services had objective value at the time of the transaction,[16] the district court concluded Golf Channel provided reasonably equivalent value for Stanford's contract payments.  The court refused to categorically presume that vendors incidentally supporting a Ponzi scheme—like utility and office supply companies—provide no value in an otherwise good-faith transaction.  In sum, the court concluded that Golf Channel did not actively promote or participate in the Ponzi scheme and, therefore, was an innocent trade creditor that had provided reasonably equivalent value in the form of media-advertising services.

On appeal, the Fifth Circuit initially reversed and rendered judgment in the Receiver's favor.[17]  Disregarding the significant market value of the media-advertising services Golf Channel sold to Stanford, the court held those services provide zero value to a Ponzi scheme's creditors.[18]  On panel rehearing, however, the Fifth Circuit vacated its prior opinion and, in a certified question, asks "what showing of 'value' under TUFTA is sufficient for a transferee to prove the elements of the [good-faith] affirmative defense?"[19]  The overarching issue—whether Stanford's payments to Golf Channel may be rescinded and the funds returned to Stanford's estate—turns on the proper construction of the relevant provisions in TUFTA.

---

[16] As the district court explained, "The right to air commercials on Golf Channel has value; otherwise Golf Channel's business model would crash." *Janvey v. TGC, LLC*, No. 3:11-CV-00294, Document 93, at 13 (N.D. Tex. filed Nov. 5, 2013) (available at https://www.pacer.gov).

[17] *Golf Channel I*, 780 F.3d at 642.

[18] *Id.*

[19] *Golf Channel II*, 792 F.3d at 547.

## II. Discussion

## A. Overview

TUFTA's purpose is to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach.[20]  Under TUFTA, a transfer made with actual or constructive intent to defraud any creditor may be avoided to the extent necessary to satisfy the creditor's claims:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation:
>
>> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[21]

In determining actual intent under subsection (a)(1), TUFTA provides a list of eleven, nonexclusive indicia of fraudulent intent, including transfer to an insider, concealment of the transfer, debtor-retained control of the property after the transfer, debtor-involved litigation prior to transfer, and failure to obtain consideration reasonably equivalent to the value of the asset

---

[20] *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015) ("[TUFTA] is designed to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors"); *accord* UNIF. FRAUDULENT TRANSFER ACT § 3, cmt. 2, 7A pt. II U.L.A. 48 (2006).

[21] TEX. BUS. & COM. CODE § 24.005(a); *accord id.* § 25.006(a) (transfer is fraudulent as to present creditor if debtor is insolvent or made insolvent by a transfer and debtor did not receive reasonably equivalent value); *see also id.* § 24.008 (creditor remedies for fraudulent transfer).

transferred.[22]  Evidence of a single "badge of fraud" does not conclusively demonstrate intent, but a confluence of several presents a strong case of fraud.[23]  Intent to defraud is ordinarily a fact question.[24]

When a Ponzi scheme is involved, however, courts applying TUFTA analogues have bypassed the statutory badges-of-fraud analysis in favor of a conclusive presumption that transfers in furtherance of the scheme were made with actual intent to defraud.[25]  Such transfers are fraudulent per se, the theory goes, based on the enterprise's illegality and incipient insolvency, which is also conclusively presumed.[26]  Because the Fifth Circuit has adopted these presumptions,[27] Stanford's transfer of $5.9 million to Golf Channel was considered fraudulent as a matter of law.[28]  As such, both the district and appellate courts held Golf Channel must surrender its compensation unless it

---

[22] *Id.* § 24.005(b).

[23] *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 843 (Tex. App.—Dallas 2006, no pet.).

[24] *Queen v. Dupree*, 303 S.W.2d 769, 774 (Tex. 1957); *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

[25] *See* cases, *supra*, n.4.

[26] *Id.*

[27] We express no opinion regarding the validity of the Fifth Circuit's conclusive Ponzi-scheme presumptions. Neither party briefed the issues before this Court or in the federal appellate proceeding; the issues are well beyond the certified question's scope; and we need not address the matter to answer the certified question. *See State Office of Risk Mgmt. v. Carty*, 436 S.W.3d 298, 301 n.3 (Tex. 2014) (declining to address an unbriefed issue beyond the scope of the certified question); *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 751 (Tex. 2006) (declining to address an unnecessary issue "not framed by the certified question"); *see also Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 767 (Tex. 2014) (citing advisory-opinion concerns in deciding not to consider an issue when the Court's disposition of another issue resolved the parties' dispute). Though we need not consider the validity *vel non* of the Ponzi-scheme presumptions, we note that TUFTA provides only one express presumption: "A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent." Tex. Bus. & Com. Code § 24.003(b).

[28] The Fifth Circuit relied on Golf Channel's stipulation that, under that court's precedent, the transfer was fraudulent per se because Stanford was engaged in a Ponzi scheme. *Golf Channel I*, 780 F.3d at 644.

establishes the affirmative defense in TUFTA section 24.009(a), which applies in actual-intent cases and protects "a person who took [the transfer] in good faith and for a reasonably equivalent value."[29] The question certified to this Court concerns only the "reasonably equivalent value" requirement of the affirmative defense.

As to that issue, the district court determined Golf Channel's services provided value reasonably equivalent to the payments it received from Stanford.[30] The Fifth Circuit initially disagreed, concluding Golf Channel's services had no value because Stanford operated a Ponzi scheme.[31] According to the Circuit, this conclusion is inescapable because, under TUFTA, "value" must be assessed from the standpoint of Stanford's creditors and the focus of the value inquiry is "the extent to which the transferor's net worth is preserved."[32] Applying that perspective, the court held (1) Golf Channel failed to produce evidence its services preserved the value of Stanford's estate or had any utility to Stanford's creditors and (2) "Golf Channel's (unknowing) efforts to extend the Ponzi scheme had no value to the creditors," even though "they may have been quite valuable to the creditors of a legitimate business."[33] This is so, the court reasoned, because attracting new investors to a Ponzi scheme decreases the estate's value by adding new liabilities.[34] In short, because Stanford

---

[29] *See* Tex. Bus. & Com. Code § 24.009(a).

[30] *Janvey v. TGC, LLC*, No. 3:11-CV-00294, Document 93, at 16 (N.D. Tex. filed Nov. 5, 2013) (available at https://www.pacer.gov).

[31] *Golf Channel I*, 780 F.3d at 646.

[32] *Id.* at 645 (citing UFTA § 3, cmt. 2 and quoting *Warfield*, 436 F.3d at 558).

[33] *Id.* at 646.

[34] *Id.*

10

operated a Ponzi scheme, the expenditures for Golf Channel's media services further depleted the assets of an irredeemably insolvent debtor without conferring any reciprocal benefit for its creditors.

Dismissing Golf Channel's argument that incidental support of a Ponzi scheme is insufficient to negate the objective value of the services provided, the court declared that TUFTA requires value to be determined solely from the creditors' perspective and makes no exception for innocent "trade creditors" who provide services and goods.[35]  Though acknowledging that value can exist for consumables or in transactions with speculative economic benefits that never actually materialize, the court found no evidence Stanford's creditors actually or potentially benefited from Golf Channel's media-advertising services.[36]  This conclusion presumably derives from the court's view that generating business for a Ponzi scheme *necessarily* decreases the value of the estate, which would not be the case for legitimate businesses procuring similar media-advertising services.

The court left open the possibility that a narrow class of services to a Ponzi scheme might confer value from a creditor's viewpoint, providing as an example electricity services that helped preserve the debtor's real property from deteriorating.[37]  Concluding, however, that Golf Channel produced no evidence that its media-advertising services benefited Stanford's creditors, the court

---

[35] *Id.* at 647.

[36] *Id.* (distinguishing *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1123-27 (5th Cir. 1993), *abrogated on other grounds by In re Dunham*, 110 F.3d 286 (5th Cir. 1997), in which value existed when a debtor paid the jet-fuel bill of a third-party airline company in a financially unsuccessful attempt to bolster a strategic alliance with the company).

[37] *Id.* at 646 n.7.

found value lacking as a matter of law and did not reach the secondary inquiry of whether the value exchanged was reasonably equivalent.[38]

On rehearing, the panel vacated its opinion and certified a statutory-construction question to this Court, citing tension between an UFTA comment regarding the definition of "value," which is not found in our statute, and TUFTA's definition of "reasonably equivalent value," which has no parallel in UFTA or in any other state's uniform fraudulent-transfer statute.[39] The court commented that the latter "suggests that value should be measured from the perspective of a buyer in the general marketplace, not from the perspective of creditors," while the former states that "[c]onsideration having no utility from a creditor's viewpoint does not satisfy the statutory definition [of value]."[40] Although admitting that a transfer of services or other consumables to a debtor would normally confer value, the Fifth Circuit stated "the case before us may be different because Stanford was engaged in a Ponzi scheme, not a legitimate enterprise."[41]

---

[38] Under analogous statutory schemes, courts evaluating whether an exchange was for "reasonably equivalent value" typically employ a two-step analysis: (1) whether the debtor received any value and (2) whether the value exchanged was reasonably equivalent. *See In re Brobeck, Phleger & Harrison LLP*, 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009) (collecting cases describing the two-step process); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 336 (S.D. Tex. 2008); *In re King & Assocs.*, 295 B.R. 246, 283 (Bankr. N.D. Ill. 2003); *In re Universal Clearing House Co.*, 60 B.R. 985, 998 (D. Utah 1986); *cf.* 5 COLLIER ON BANKRUPTCY ¶ 548.05[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) ("The initial determination of whether the debtor received any value is typically easy and resolved by applying [the statutory] definition. Transactions that satisfy, discharge or secure all or part of an otherwise legitimate obligation are for 'value;' transactions that are gifts or effectively gifts . . . are not.").

[39] *See Golf Channel II*, 792 F.3d at 545.

[40] *Id.* at 544-45 (comparing TEX. BUS. & COM. CODE § 24.004(d) with UFTA § 3, cmt. 2).

[41] *Id.* at 546.

## B. "Value" and "Reasonably Equivalent Value"

In section 24.004, TUFTA specially defines both "value" and the subsumed concept of "reasonably equivalent value," as follows:

(a) Value is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

. . . .

(d) "Reasonably equivalent value" includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction.[42]

Notably, neither definition is exclusive.[43]

TUFTA's definition of value tracks UFTA's definition precisely.[44] The comments to UFTA explain:

The definition [of value] . . . is not exclusive. "Value" is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition. The definition does not specify all the kinds of consideration that do not constitute value for the purposes of this Act—*e.g.*, love and affection.[45]

---

[42] TEX. BUS. & COM. CODE § 24.004(a), (d).

[43] *See id.*; *see also* UNIF. FRAUDULENT TRANSFER ACT § 3, cmt. 2.

[44] *See* UNIF. FRAUDULENT TRANSFER ACT § 3(a).

[45] *Id.* § 3, cmt. 2.

Variants of "value," including "reasonably equivalent value," are not defined in UFTA, but are clearly encompassed in the broader definition.[46]   As the parties acknowledge, both value and reasonable equivalency are determined as of the time of the transaction, not in hindsight.[47] Assuming consideration of value is exchanged in the first instance, "[t]he concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the market place for the [asset] transferred."[48]

Given the broad, nonexclusive definitions of "value" and "reasonably equivalent value," the services Golf Channel provided indisputably had objective value at the time of the transaction, even if Stanford was insolvent or imminently insolvent at the time.[49]   Certainly, had Stanford not purchased Golf Channel's television air time, the services would have been available to another buyer at market rates.   The parties, however, advocate divergent methods of assessing value in the Ponzi-scheme context, disputing what it means to consider "utility [of the consideration] from a creditor's viewpoint" and how TUFTA's market-value inquiry applies.

---

[46] *Id*. § 3, cmt. 1 ("This section defines 'value' as used in various contexts in this Act, frequently with a qualifying adjective [including 'reasonably equivalent value'].").

[47] *See, e.g., In re R.M.L., Inc.*, 92 F.3d 139, 153 (3d Cir. 1996) (reviewing "the transaction at the time the transfer was made"); *In re Chomakos*, 69 F.3d 769, 770 (6th Cir. 1995) (the relevant point in time for determining whether debtors received "reasonably equivalent value in exchange for the money they wagered at the casino is the point at which their bets were placed"); *In re Fairchild Aircraft Corp.*, 6 F.3d at 1127 (assessing value "as of the time the investment was made"); *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) ("The date for defining such reasonable equivalence is the date of the transfer . . . ."); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.03[5] ("It is valued as of the date of the transfer.").

[48] *In re Ozark Rest. Equip. Co.*, 850 F.2d 342, 344-45 (8th Cir. 1988).

[49] *See Golf Channel I*, 780 F.3d at 646-47 (recognizing that Golf Channel's services "may have been quite valuable to the creditors of a legitimate business" and did not "lack[] value in the abstract").

14

The Receiver maintains that (1) only the creditors' perspective is of consequence in determining whether, as a threshold matter, any value was exchanged at the time of the transfer, (2) only transactions that preserve or improve the debtor's estate (or presumably carry the potential to do so) confer value within TUFTA's meaning, and (3) this conclusion is mandatory because TUFTA's purpose is to "protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors."[50]  The Receiver categorically rejects market value as a relevant consideration at the first step of the value inquiry.  Consequently, the Receiver contends the exemplary market-value inquiry in the statutory definition of "reasonably equivalent value" is irrelevant to the existence of "value" because it does not answer the pertinent inquiry, which is whether the debtor's estate was preserved or (potentially) enriched by the transaction.  When TUFTA's reasonably equivalent value definition does come into play, the Receiver interprets it as applying only when a debtor sells an asset of disputed worth.  The Receiver asserts that the definition finds purpose in such a case by providing a "range of values" yardstick for reasonable equivalency and is not implicated here because the value of the asset Stanford transferred to Golf Channel is fixed and certain.

Applying this paradigm to the realities of the transaction at hand, the Receiver argues that Golf Channel's advertising services—even if effective—would only attract new investors, enable the Ponzi scheme to continue, and thrust it further into insolvency.[51]  As a result, the Receiver insists

---

[50] Unif. Fraudulent Transfer Act § 3, cmt. 2, 7A pt. II U.L.A. 48 (2006); *see* Tex. Bus. & Com. Code § 24.012 (directing that TUFTA be "applied and construed to effectuate its general purpose to make uniform the law with respect to [fraudulent transfers] among states enacting [UFTA]").

[51] *See Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) (recognizing that "the longer a Ponzi scheme is kept going the greater the losses to the investors"); *see also Warfield*, 436 F.3d at 560 (explaining "[t]he primary consideration in analyzing the exchange of value for any transfer is the degree to which the [debtor's] net worth is preserved").

Golf Channel's services constituted no value at the time of the transaction. Accepting that media-advertising services on a major cable network would certainly be useful to creditors of a legitimate business, and may have had utility to Stanford, the Receiver nevertheless stresses that such services had no utility to Stanford's creditors and the payments made to acquire those services prejudiced Stanford's creditors by depleting the estate's assets. The Receiver thus champions a value inquiry that turns on how Stanford's creditors—either gifted with the clarity of hindsight or imputed with the debtor's knowledge—would have valued the consideration at the time of the exchange. In the Receiver's view, to ensure consistency and uniformity of fraudulent-transfer laws, proof of market value—an objective standard—cannot be sufficient to establish the existence of value from a creditor's perspective under TUFTA.

Golf Channel has no quarrel with determining value from a creditor's viewpoint, but charges the Receiver with improperly applying a retrospective value inquiry and focusing on a subjective evaluation by the debtor's creditors rather than viewing the transaction from a reasonable creditor's perspective.[52] Golf Channel asserts that, regardless of whose viewpoint is contemplated, consideration that has objective value at the time of the transaction meets the statutory definition of value without regard to the ultimate impact on the debtor's estate.[53] Golf Channel finds support for

---

[52] *Cf. In re Mercury Cos.*, 527 B.R. 438, 447 (D. Colo. 2015) ("Reasonable equivalence is viewed objectively and from the perspective of the debtor's creditors, without regard to the subjective needs or perspectives of the debtor or transferee." (internal citations omitted)); *Nat'l Loan Inv'rs, L.P. v. Robinson*, 98 S.W.3d 781, 783-84 (Tex. App.—Amarillo 2003, pet. denied) (recognizing creditor perspective as "the relevant focal point" under TUFTA and observing that "whether the debtor received reasonably equivalent value for the property he transferred is determined from . . . the reasonable creditor's viewpoint").

[53] *See In re Fin. Federated Title & Trust, Inc.*, 309 F.3d 1325, 1332 (11th Cir. 2002) (concluding the value inquiry should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise); *see also In re Chomakos*, 69 F.3d at 772 (declining to evaluate transactions solely from creditors' perspective in cases involving non-tangible or consumable goods and services, such as gambling and dining

an objective determination of value in section 24.004(d)'s special definition of "reasonably equivalent value." Assuming *arguendo* that the specific example in the definition describes only a situation in which a debtor has sold assets,[54] Golf Channel reasons that if fair market value in an arm's-length transaction demonstrates a debtor received reasonably equivalent value when it sold an asset, it follows that the debtor received reasonably equivalent value when it purchased an asset, product, or service at market prices. Golf Channel, joined by several amici,[55] warns that embracing the Receiver's value analysis would wreak economic havoc if good-faith merchants are required to forfeit their earnings unless they prove that, at the end of the day, the transaction conferred some secondary or residual benefit to the estate or, at a minimum, did not further the debtor's insolvency.

The answer to the certified question thus turns on the proper construction and application of the terms "value" and "reasonably equivalent value" as used in TUFTA.

---

expenditures); *In re Grigonis*, 208 B.R. 950, 955-56 (Bankr. D. Mont. 1997) (consideration immediately and completely consumed, such as a service, has "a liquidation or 'second-hand' value of zero" and "by definition, always results in asset depletion," but it is "nonsense" to conclude that such transfers are fraudulent merely because "transfers of funds to secure such enjoyments can by definition be of no value" from the viewpoint of creditors).

[54] The Fifth Circuit noted confusion about whether the specific example in section 24.004(d) describes only the debtor's side of the transaction or whether it could apply to either side of the transaction. *Golf Channel II*, 792 F.3d at 545. Section 24.004(d) uses the word "transferor," which is not defined or used elsewhere in the statute, instead of the term "debtor," which is a defined term and is used consistently throughout the statute. Tex. Bus. & Com. Code §§ 24.002(6), .004(d). Use of the broader term "transferor" suggests viewing the example as applying to either side of the transaction. However, the example also employs the term "assets," and the term "asset," is specially defined in TUFTA as referring to "property of a debtor." *Id.* § 24.002(2); *cf.* Tex. Gov't Code § 312.003(b) ("The singular includes the plural and the plural includes the singular unless expressly provided otherwise.").

[55] ATP Tour, Inc.; David Toms; David Toms Golf, LLC; IMG Worldwide, Inc.; International Players Championship, Inc.; JPMorgan Chase Bank, N.A.; Merge Healthcare Inc.; PGA Tour, Inc.; Texas Association of Broadcasters, Texas Cable Association; and The University of Miami.

## C. Analysis

### 1. Guiding Principles

Our primary objective in construing a statute is to ascertain and effectuate the Legislature's intent without unduly restricting or expanding the statute's scope.[56] We derive intent from the plain meaning of the text construed in light of the statute as a whole.[57] The terms of a statute bear their ordinary meaning unless (1) the Legislature has supplied a different meaning by definition, (2) a different meaning is apparent from the context, or (3) applying the plain meaning would lead to absurd results.[58] TUFTA further directs that it be "applied and construed to effectuate its general purpose to make uniform the law with respect to [fraudulent transfers] among states enacting [UFTA]."[59]

TUFTA is modeled after UFTA, and although the two are not identical, our Legislature has adopted UFTA's definition of "value."[60] Because UFTA's definition of "value" is based on section 548(d)(2)(A) of the Bankruptcy Code,[61] courts interpreting UFTA-based statutes consider analogous

---

[56] *See City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 641 (Tex. 2013).

[57] *Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492, 494 (Tex. 2013).

[58] *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010).

[59] TEX. BUS. & COM. CODE § 24.012; *see First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86 (Tex. 2003).

[60] *See* TEX. BUS. & COM. CODE § 24.004(a); UNIF. FRAUDULENT TRANSFER ACT § 3(a).

[61] *See* UNIF. FRAUDULENT TRANSFER ACT § 3, cmt. 2, 7A pt. II U.L.A. 48 (2006) (definition of "value" is "adapted from § 548(d)(2)(A) of the Bankruptcy Code"). *Compare* TEX. BUS. & COM. CODE § 24.004(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."), *with* 11 U.S.C. § 548(d)(2)(A) ("'[V]alue' means property, or satisfaction or securing of a present or antecedent debt of the debtor or to a relative of the debtor.").

18

bankruptcy authority to be instructive of the proper meaning and application of that term and the related concept of reasonably equivalent value.[62] Though the text of our statute is ultimately determinative of legislative intent, we may consider the construction afforded the pertinent terms in cases applying section 548 of the Bankruptcy Code[63] and similar provisions in UFTA statutes enacted by other states.[64] We may also consult comments accompanying the model law,[65] but we remain mindful that UFTA's comments were not adopted by our Legislature and cannot alter the plain meaning of the words enacted, which are "the truest manifestation of what legislators intended."[66] With these principles in mind, we turn to the question presented.

## 2. Consideration Constituting "Value"

TUFTA operates to "prevent debtors from defrauding creditors by placing assets beyond their reach,"[67] but it also protects transferees "who took in good faith and for a reasonably equivalent

---

[62] *See, e.g.*, *Frank Sawyer Trust of May 1992 v. C.I.R.*, 712 F.3d 597, 608 n.2 (1st Cir. 2013) (interpreting Massachusetts law); *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007) (interpreting Illinois law); *In re Walter*, 462 B.R. 698, 709 (Bankr. N.D. Iowa 2011); *In re Hemstreet*, 258 B.R. 134, 139 (Bankr. W.D. Pa. 2001).

[63] *See Bowman v. El Paso CGP Co.*, 431 S.W.3d 781, 786 n.6 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (considering bankruptcy cases interpreting "reasonably equivalent value" persuasive); *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007) (citing cases interpreting "reasonably equivalent value" under UFTA in the same manner as the interpretation of the phrase in the Bankruptcy Code).

[64] *See Nathan v. Whittington*, 408 S.W.3d 870, 873 (Tex. 2013) (reviewing interpretation of a TUFTA provision to be "as consistent as possible with the construction of other states that have enacted a Uniform Fraudulent Transfer Act containing a similar provision").

[65] *See id.* ("In the absence of any uniformity among the other states, we have also considered the comments of the National Conference of Commissioners on Uniform State Laws, which promulgated the model UFTA.").

[66] *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006).

[67] *KCM Fin.*, 457 S.W.3d at 89.

value."[68]  In fact, if "a reasonable equivalent has been given in good faith for a transfer or obligation [the transferee has] a *complete defense* although the debtor is shown to have intended to hinder, delay, or defraud creditors."[69]  The statute thus establishes a counterbalance that must be given effect in the construction and application of the broadly defined terms "value" and "reasonably equivalent value."[70]

Uniformity is a stated objective of the statute, but TUFTA is unique among uniform fraudulent-transfer laws because it provides a specific market-value definition of "reasonably equivalent value."[71]  Use of the terms "includes" and "without limitation" to define the term is significant, revealing the Legislature intended to provide a paradigmatic—but nonexclusive—example of an exchange that conclusively satisfies the "reasonably equivalent value" requirement found in various provisions in the statute, including the affirmative defense in section 24.009(a).[72]  The illustration provided in the statutory definition is an exchange by the transferor that

---

[68] TEX. BUS. & COM. CODE § 24.009(a).  The statutory defense also protects "any subsequent transferee or obligee." *Id.*

[69] *See* UNIF. FRAUDULENT TRANSFER ACT, 7A pt. II U.L.A. 6 (2006) (emphasis added).

[70] *See Golf Channel II*, 792 F.3d at 547 ("It is clear TUFTA was designed to strike a balance between protecting the creditors of an insolvent business while at the same time ensuring that third-party merchants and transferees (who, ironically, may also be creditors post-bankruptcy) would have an affirmative defense to protect their earnings.").

[71] Other states have not similarly adopted a specific definition of "reasonably equivalent value." *See* UNIF. FRAUDULENT TRANSFER ACT § 3, 7A pt. II U.L.A. 49-50 (2006).

[72] *See In re E.C.R.*, 402 S.W.3d 239, 246 n.6 (Tex. 2013) (explaining the illustrative, non-exhaustive import of the term "includes"); *see also* TEX. BUS. & COM. CODE §§ 24.004(d), .009(a); *see also id.* §§ 24.005(a)(2) (constructive fraud as to present and future creditors is established, in part, by the absence of a reasonably equivalent value exchange), .005(b)(8) (absence of a reasonably equivalent value exchange is one of several indicia of actual intent to defraud), .006(a) (constructive fraud as to present creditors is established, in part, by the absence of a reasonably equivalent value exchange).

occurred for fair market value in an arm's-length transaction.[73]  As the definition's use of the conditional past-perfect tense "would have" illustrates, whether an exchange was made for reasonably equivalent value is evaluated objectively at the time of the transfer, not in retrospect.

TUFTA's general definition of "value" is also illuminating in what it expressly excludes from the definition:  "[V]alue does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."[74] From the exclusion of unperformed promises not made in the ordinary course of business, it follows that other types of enforceable promises made or performed in the ordinary course of the promisor's business would constitute value under TUFTA.[75]  More to the point, the exclusion suggests that the nature of the transaction as being in the ordinary course of business or involving a promise performed bears more than a passing relevance to the "value" inquiry.[76]

While the definitions of "value" and "reasonably equivalent value" are expansive and nonexclusive, there is nevertheless an implicit requirement that the transfer confer some direct or

---

[73] *Cf. Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 832 (Tex. 2014) (contrasting "sweetheart deal[s]" that do not demonstrate "fair market value at the time of the sale" with "arm's length transactions"); TEX. NAT. RES. CODE § 91.402(i) (defining the term "market value" to mean the amount that is received as a result of "an arm's-length transaction").

[74] TEX. BUS. & COM. CODE § 24.004(a).

[75] *Cf.* 2 EPSTEIN, NICKELS & WHITE, BANKRUPTCY § 6-49, at 21 (1992) (discussing exclusion from Bankruptcy Code's definition of "value" and noting that "[t]he strong negative implication of this exclusion is that any other kind of enforceable executory promise is value for purposes of section 548"); 5 COLLIER ON BANKRUPTCY ¶¶ 548.03[5] ("[W]ith only limited exceptions, 'any . . . kind of enforceable executory promise is value for purposes of [Bankruptcy Code] section 548."), .05[2][a]("The initial determination of whether the debtor received any value is typically easy and resolved by applying [Bankruptcy Code] section 548(d)'s definition.  Transactions that satisfy, discharge or secure all or part of an otherwise legitimate obligation are for 'value;' transactions that are gifts or effectively gifts . . . are not.")

[76] *See In re Richards & Conover Steel, Co.*, 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001) (citing 2 EPSTEIN, NICKELS & WHITE, BANKRUPTCY § 6-49, at 33 (1992)).

indirect economic benefit to the debtor,[77] as opposed to benefits conferred solely on a third-party,

transfers that are purely gratuitous, and transactions that merely hold subjective value to the debtor

or transferee.[78]  This is so because value must "be determined in light of the purpose of the Act to

protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors."[79]

Accordingly, love and affection, and other types of consideration that have "no utility from a

creditor's viewpoint" do not confer value for an exchange.[80]  Rather, consideration "must go beyond

---

[77] *See In re Fairchild*, 6 F.3d at 1127 ("Rather, the recognized test is whether the investment conferred an economic benefit on the debtor; which benefit is appropriately valued as of the time the investment was made."); *In re Cottrill*, 118 B.R. 535, 537 (Bankr. S.D. Ohio 1990) (to be valueless, there must be a "lack of economic benefit flowing to the entity making the transfer"); 2 EPSTEIN, NICKELS & WHITE, BANKRUPTCY § 6-49, at 22 (1992) (explaining that the "implicit requirement of 'economic benefit'" as the standard for "value" under the Bankruptcy Code stems from the law's purpose of "protect[ing] the debtor's unsecured creditors by preserving the value of the debtor's estate to which they must look for satisfaction of their claims"); *cf.* 5 COLLIER ON BANKRUPTCY ¶ 548.05[2][a] ("In the case of individual debtors, . . . occasionally a court will find that entertainment and other forms of recreation can constitute reasonably equivalent value.").

[78] *See, e.g.*, *Badger State Bank v. Taylor*, 688 N.W.2d 439, 445-46 (Wis. 2004) (canceling the debt a third party owed to the transferee "did not inure to the benefit of [the debtor] at all"); *In re Schaefer*, 331 B.R. 401, 419 (Bankr. N.D. Iowa 2005) ("Thus, value must confer a direct, economic benefit upon the debtor, rather than an intangible, psychological benefit."); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.05[2][c] ("By definition, a gift or other gratuitous transfer involves no value at all.  So do transactions such as guaranties in which the debtor obligates itself to pay the debts of another."). *But see In re Chapman Lumber Co.*, No. 05-00408, 2007 WL 2316528, *6 (Bankr. N.D. Iowa 2007) (applying Iowa good-faith defense, concluding "reasonably equivalent value" should be determined by examining what "[the innocent transferee] gave, rather than what Debtor received," and holding a hair-removal services provider was protected by the affirmative defense even though the debtor paid for the services to be provided for a third party).  *Id.* In this case, the transaction was not gratuitous, and there is no indirect or third-party-benefit issue because Stanford was the direct recipient of Golf Channel's services.

[79] *See* UNIF. FRAUDULENT TRANSFER ACT § 3, cmt. 2, 7A pt. II U.L.A. 48 (2006); 2 EPSTEIN, NICKELS & WHITE, Bankruptcy § 6-49, at 22 (1992) (discussing rationale for "implicit requirement of 'economic benefit'").

[80] UNIF. FRAUDULENT TRANSFER ACT § 3, cmt. 2, 7A pt. II U.L.A. 48 (2006); *see also* 2 EPSTEIN, NICKELS & WHITE, BANKRUPTCY § 6-49, at 22 (1992) ("Thus, for purposes of section 548, there is no value in the making of a gift or in the receipt of love and affection or the promise of the same.").

some speculative, ephemeral[,] psychic satisfaction" to constitute "value" or "reasonably equivalent value."[81]

Importantly, however, the "requirement of economic benefit to the debtor does not demand consideration that replaces the transferred property with money or something else tangible or leviable that can be sold to satisfy the debtor's creditors' claims."[82]  This is especially so when a debtor purchases services or consumable goods.   A construction of the term "value" that would automatically or effectively exclude consideration in the form of consumable goods or services—for example, food, utilities, internet or telephone services, office supplies, and employee compensation or benefits—is simply unsupportable under a plain reading of the statute.

In such cases "the debtor received value in the supplier performing the consideration or promising to do so," even if in reality, payment for the services depleted estate assets and merely offset the liability that arose when the debtor incurred the obligation to pay for the services or goods

---

[81] *Mann v. Hanil Bank*, 920 F. Supp. 944, 954 (E.D. Wis. 1996); *see, e.g.*, *Tavenner v. Smoot*, 257 F.3d 401, 408-09 (4th Cir. 2001) (hope of future employment not reasonably equivalent value); *In re Bargfrede*, 117 F.3d 1078, 1080 (8th Cir. 1997) (marital harmony and preservation of family not reasonably equivalent value); *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 249 (5th Cir. 1990) (spiritual benefits not reasonably equivalent value); *In re Treadwell*, 699 F.2d 1050, 1051 (11th Cir. 1983) (love from children inadequate consideration); *In re Guerrera*, 225 B.R. 32, 36-37 (Bankr. D. Conn. 1998) (family obligation to support sister not reasonably equivalent value); *McPherson Oil Co. v. Massey*, 643 So.2d 595, 596-97 (Ala. 1994) (love and affection not valuable consideration).

[82] *In re Richards & Conover Steel, Co.*, 267 B.R. at 612 (quoting 2 EPSTEIN, NICKELS & WHITE, BANKRUPTCY § 6-49 at 23 (1992)).  By selectively quoting an abbreviated version of the cited treatise, the Receiver attempts to cabin this accepted principle by suggesting it applies only when a debtor's liability was reduced or the net worth of the debtor was preserved.  But Professor Epstein describes common examples of this principle as including "services that the debtor buys," essentially "viewed as paying an antecedent debt for services." 2 EPSTEIN, NICKELS & WHITE, BANKRUPTCY § 6-49, at 23 (1992).  *See also* 5 COLLIER ON BANKRUPTCY ¶ 548.05[2][a] (applying a creditor's perspective "does not mean, however, that the value received by the debtor must be something on which creditors can levy; particular [sic] with respect to valuable services, such as legal or other similar professional services, courts will not factor in a lack of tangible increase in physical assets" but courts will discount "intangible and transitory assets and rights that have value only to the debtor").

in the first instance.[83]   The purpose of fraudulent conveyance law "is not to protect the debtor's

creditors from all transfers that have no realizable economic benefit.  Indeed, . . . the law actually

tolerates some transfers that diminish the value of their claims by reducing the amount of leviable,

saleable assets, such as transfers in exchange for services."[84]  In fact, the definition of value expressly

includes a transfer made to satisfy an antecedent debt, even though satisfaction of the debt would

deplete estate assets that might otherwise have been available for the benefit of creditors.[85]

     Furthermore, under TUFTA, whether consideration has value is a distinct inquiry from

whether the exchange of consideration enhanced or gave rise to the debtor's insolvency.[86]

Accordingly, we must avoid a construction of the terms "value" and "reasonably equivalent value"

that collapses these separate inquiries by elevating the debtor's insolvency to determinative status.

     Finally, although not an analytical construct specifically articulated in TUFTA, applying a

creditor's viewpoint as the value-inquiry standard is consistent with the body of instructive

authority.[87]   But while UFTA's comments prescribe a creditor's viewpoint as to the utility of

---

[83] 2 EPSTEIN, NICKELS & WHITE, BANKRUPTCY § 6-49, at 24 n.45 (1992).

[84] *Id.* (discussing section 548 of the Bankruptcy Code).

[85] TEX. BUS. & COM. CODE § 24.004(a).

[86] *See id.* §§ 24.005(a)(2) (constructive fraud is established if (1) no reasonably equivalent value is exchanged and (2) the debtor is actually or imminently insolvent), .006(a) (transfer fraudulent as to present creditor if (1) no reasonably equivalent value is exchanged and (2) the debtor is insolvent or became insolvent by virtue of the transaction).

[87] *See, e.g., In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010) ("Reasonably equivalent value is the value of the property on the date of the transfer from the perspective of the creditors."); *In re Kelsey*, 270 B.R. 776, 781 (B.A.P. 10th Cir. 2001) ("Value is not measured from the subjective, emotional perspective of [the debtor], but instead from the objective, economic perspective of his creditors."); *Badger State Bank*, 688 N.W.2d at 449-50.  *But see In re Chomakos*, 69 F.3d at 772 ("As far as federal law is concerned, moreover, we are not persuaded that we ought to evaluate the transactions at issue here solely from the standpoint of creditors.").

consideration, it does not impose a subjective value inquiry nor countenance a retrospective one.[88] Neither does TUFTA.  Evaluating value subjectively from a creditor's vantage point would effectively negate a transferee's good faith defense in certain categories of transactions—namely, intangible services and consumable goods—even though the statute does not support a distinction based on the type of consideration exchanged.  In contrast, an objective inquiry that considers the existence of value—or utility of consideration—from a reasonable creditor's perspective at the time of the transaction (1) is consistent with the statute's language and (2) strikes an appropriate balance between protecting creditors and protecting third-party vendors and other transferees who have given reasonably equivalent value in good faith.

Under a plain reading of TUFTA, value exists when the debtor took consideration that had objective value at the time of the transfer, even if the consideration neither preserved the debtor's estate nor generated an asset or benefit that could be levied to satisfy unsecured creditors.[89]  The reasonably equivalent value requirement in section 24.009(a) is thus satisfied if a transferee performs objectively valuable services or transfers goods in an arm's-length transaction at market-value rates.

---

[88] *Cf. In re Grigonis*, 208 B.R. at 955-56 (in an action to clawback payments made for telephone service under Montana UFTA and bankruptcy law, court refused to apply subjective creditor's perspective of "value" that would render services and consumables valueless as a matter of law).

[89] *See, e.g., In re R.M.L., Inc.*, 92 F.3d at 149 (value is exchanged when a debtor obtains a benefit from services performed, such as clean windows received in exchange for payment to a window-washer); *In re Chomakos*, 69 F.3d at 771(the chance of winning a bet placed at a casino constituted value at the time the bet was placed); *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 308 (S.D.N.Y. 2001) ("Value is present if the debtor receives a fair equivalent in exchange for its property or obligation.").

This is not to say, however, that such circumstances are necessary to constitute value, but they are certainly sufficient.[90]

The question that lingers is whether TUFTA commands a statutory sleight of hand by which objective value disappears depending on the lens through which the transaction is viewed.  In other words, does objectively valuable consideration become valueless based on the true nature of the debtor's business as a Ponzi scheme or the debtor's subjective reasons for procuring otherwise lawful services?

### 3. Divergent Views of "Value" and "Reasonably Equivalent Value" in the Ponzi-Scheme Context

There is little consensus about whether, and under what circumstances, consideration provided to a Ponzi scheme can constitute "value" or "reasonably equivalent value."[91]  The question typically arises in cases involving the following types of Ponzi-scheme expenditures:  (1) repayment of investors' principal investments; (2) interest payments to investors (i.e., false profits); and (3) payments to brokers and others who, perhaps unwittingly, helped sell Ponzi-scheme products.[92]

---

[90] *Cf. In re R.M.L., Inc.*, 92 F.3d at 148 (agreeing that "the mere 'opportunity' to receive economic benefit in the future constitutes 'value'"); *Mellon Bank, N.A. v. Metro Comm'cns*, 945 F.2d 635, 647-48 (3d Cir. 1991) (characterizing good will as an intangible asset and expected synergy from the affiliation of two corporations as valuable).

[91] *See Carroll v. Stettler*, 941 F. Supp.2d 572, 581 (E.D. Pa. 2013) ("Courts have been divided as to whether a transfer to a salesperson or broker in the Ponzi scheme context can ever be an exchange for reasonably equivalent value."); *In re Carrozzella & Richardson*, 286 B.R. 480, 487 (D. Conn. 2002) ("There is a sharp split of authority on the issue of whether the payment of interest by a Ponzi scheme operator can ever constitute reasonably equivalent value.").

[92] *See, e.g., Brown*, 767 F.3d at 441, 443 (Ponzi-scheme investors could not retain interest payments due under illegal contracts that were "void and unenforceable," but could retain their principal repayments); *Warfield*, 436 F.3d at 555, 559-60 (Ponzi-scheme investor sought to retain "commissions" paid for promoting the investments to others, but the court, applying Washington UFTA and citing cases involving illegal services under illegal contracts, held there was no reasonably equivalent value as a matter of law); *Scholes*, 56 F.3d at 757 (Ponzi-scheme investor could not keep profits at the expense of defrauded investors because it reduced the estate's net assets without an offsetting equivalent benefit to the estate); *In re Fin. Federated Title & Trust, Inc.*, 309 F.3d at 1332-33 (holding the corporate employee of a Ponzi

Courts holding investors' interest payments or brokers' commissions were not exchanged for value focus on the nature of the debtor's enterprise, illegality of the services rendered, or illegality of the agreements under which payments were made. Because acquiring new investors or continuing to use investors' money ultimately extends the Ponzi scheme to the detriment of later investors, these courts hold that no value was exchanged for the debtor's expenditures in furtherance of the scheme.[93] These cases turn on the nature of a Ponzi scheme and the application of a presumption that a transfer from a Ponzi scheme is not for "value"—and therefore not "for reasonably equivalent value"—as a matter of law.[94] Under this approach to evaluating value, proof of the objective value a debtor received from a transfer is insufficient; instead, the transfer must have "preserved the value of [the debtor's] estate" or otherwise provided value to the Ponzi-scheme operator's creditors.[95]

---

scheme was not automatically barred from asserting her affirmative defense to disgorgement of compensation received "for value and in good faith"); *In re Randy*, 189 B.R. 425, 442 (Bankr. N.D. Ill. 1995) (as a matter of law, brokers who procured new Ponzi-scheme investors and enticed existing ones to keep their principal interests in place provided "no value").

[93] *See In re Carrozzella & Richardson*, 286 B.R. at 488 (describing collected cases as emphasizing "that 'value' must be viewed from an objective standpoint and that, if use of investors' money was of 'value' to the debtor, the only 'value' was to perpetuate the Ponzi scheme," and thus, the value, "if anything, was 'negative value'"); *Golf Channel II*, 792 F.3d at 544 (describing *Warfield*, 436 F.3d at 559-60, as "holding that broker services furthering a Ponzi scheme have no value as a matter of law"); *Warfield*, 436 F.3d at 560 ("It takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefited from his efforts to extend the fraud by securing new investments."); *In re Randy*, 189 B.R. at 441 (concluding the brokers' sales efforts did not provide any value to the estate, but could "only exacerbate the harm to the debtor's creditors" by attracting new investors and extending the Ponzi scheme); *In re Int'l Loan Network, Inc.*, 160 B.R. 1, 16 (Bankr. D.D.C. 1993) (concluding "the 'services' the defendants rendered conferred no value to the estate but, in fact, only worsened its condition," which would make it "contrary to the intent of the statute and against public policy to hold that the defendants are entitled to uphold the transfers based on some hourly rate for the 'services' they performed").

[94] *See Finn*, 860 N.W.2d at 645-46 (examining the origins of the three components of the "Ponzi-scheme presumption," conclusive presumptions of actual intent, insolvency, and lack of reasonably equivalent value).

[95] *See Golf Channel II*, 792 F.3d at 546. Proof of a contractual right to payment from the Ponzi-scheme operator is also insufficient under this approach, because "courts that adopt the Ponzi-scheme presumption effectively deem a contract between the operator of a Ponzi scheme and an investor to be unenforceable as a matter of public policy." *See Finn*, 860 N.W.2d at 651.

27

In contrast, other courts have held that services or funds provided to a Ponzi-scheme operator can constitute value. The opinions in these cases "focus[] on the discrete transaction between the debtor and the defendant[s], without regard to the nature of the debtor's overall enterprise."[96] In an illustrative bankruptcy case involving a Ponzi scheme, the Eleventh Circuit held that value is not determined by the effect of the transaction on the debtor's estate, but on the value of the goods or services provided.[97] The issue in that case, *In re Financial Federated Title & Trust, Inc.*, was whether a Ponzi-scheme employee, who had been paid as a percentage of gross profits, was barred as a matter of law from asserting the "for value and in good faith" affirmative defense in section 548 of the Bankruptcy Code.[98] In holding the employee was not automatically barred from relying on the defense, the federal court dismissed the logic of cases in which courts had held that value is lacking as a matter of law in compensation transactions involving a Ponzi scheme.[99]

In explaining the basis for its holding, the federal court quoted extensively from *In re Universal Clearing House Co.*, from which "[t]he better reasoned [Ponzi-scheme] cases germinate":

> The fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value. By definition, a Ponzi scheme is driven further into insolvency with each transaction. Therefore, by the trustee's reasoning, no one who in any way dealt with, worked for, or provided services to the debtors could prevent avoidance of any transfers they received. The debtors' landlord, salaried employees, accountants and attorneys, and utility companies that

---

[96] *See In re Carrozzella & Richardson*, 286 B.R. at 488; *see also In re Fin. Federated Title & Trust, Inc.*, 309 F.3d at 1332 (agreeing that an evaluation of whether an employee of a Ponzi scheme provided value "should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise" (quoting *In re Universal Clearing House Co.*, 60 B.R. at 1000)).

[97] 309 F.3d at 1332-33.

[98] *Id.* at 1327-28.

[99] *Id.* at 1331-32.

28

provided services to the debtors all assisted the debtors in the furtherance of their
fraudulent scheme. In spite of this fact, we do not think that the goods and services that
these persons and entities provided were without value or that transfers to them could
be set aside as fraudulent conveyances. We see no material distinction between such
persons or entities and appellants. All were necessary to the success of the debtors'
scheme.

We conclude that a determination of whether value was given under Section 548
should focus on the value of the goods and services provided rather than on the impact
that the goods and services had on the bankrupt enterprise. We therefore hold that, as
a matter of law, the services provided by appellants did constitute value as that term is
used in section 548 [of the Bankruptcy Code].[100]

The Eleventh Circuit suggested that negating value based on the nature of the debtor's enterprise

would improperly conflate the independent statutory inquiries of value, insolvency, and good faith.[101]

Value is value regardless of whether the debtor is insolvent or whether either party is acting in good

faith.

In applying a more transaction-specific value inquiry, the Eleventh Circuit declined to follow

another bankruptcy case, *In re Randy*, that provides a different perspective on the matter. *Randy*

involved commissions paid to brokers who solicited investors in what turned out to be a Ponzi

scheme.[102] The court held that services provided in furtherance of the Ponzi scheme could not, as a

matter of law, confer value.[103] Given the illegality of the transactions, the court held that "no value

---

[100] *Id.* (quoting *In re Univ. Clearing House Co.*, 60 B.R. at 999-1000); *accord In re World Vision Entm't, Inc.*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002) (applying Florida UFTA and bankruptcy law in holding that "[t]he law does not require" everyone conducting business with a Ponzi scheme or fraudulent enterprise to forfeit earnings regardless of the transferee's knowledge or culpability or the actual services provided).

[101] *See id.* at 1331-32.

[102] *In re Randy*, 189 B.R. at 438.

[103] *Id.* at 442.

was or could be legally given"; accordingly, good faith was immaterial.[104]  The court was careful, however, to cabin its analysis to illegal contracts for commissions earned selling the Ponzi scheme, observing "[i]t is possible that others providing ordinary services to [the Ponzi-scheme operator] not involving the Ponzi scheme, especially employees of the Debtor, might have deserved to be paid for their services because they acted in good faith and gave value to the debtor," but not those who "received a form of profit from their work selling the Ponzi scheme."[105]

The Fifth Circuit applied a similar analysis in a pair of Ponzi-scheme cases—*Warfield v. Byron*[106] and *Janvey v. Brown*[107]—involving, respectively, commissions paid to a Ponzi-scheme investor who helped procure other investors and payments of principal and interest to Ponzi-scheme investors.  Citing cases holding no reasonably equivalent value exists for illegal services performed under illegal contracts, the Fifth Circuit held in *Warfield* that the debtor did not receive reasonably equivalent value in the form of services that extended the fraud by securing new investments.[108]

A split result ensued in *Brown*, in which the Fifth Circuit held the investors could not keep interest payments due under their investment contracts, which were illegal and therefore "void and unenforceable," but could retain repayments of their principal investments because those payments

---

[104] *Id.*

[105] *Id.*

[106] 436 F.3d at 559-60 (making an *Erie* guess under Washington UFTA).

[107] 767 F.3d at 442 (applying *Warfield* to Ponzi-scheme clawback action under TUFTA).

[108] 436 F.3d at 560.

extinguished a claim against the estate for those amounts.[109]   The Fifth Circuit's latter holding in *Brown* is in tension with the Fifth Circuit's initial holding in this case.   Golf Channel fully performed its contract with Stanford and, indisputably, would have a claim against the estate if Stanford had not paid what it owed for services rendered.   In terms of exchanging "value," the circumstances under which Golf Channel entrusted an asset to Stanford and received reciprocal compensation are not materially distinguishable from the situation in which Ponzi-scheme investors obtained repayment of the investment funds they had entrusted to Stanford.

Besides federal-court proceedings, only one state high court has addressed the Ponzi-scheme presumptions and good-faith defense under an UFTA-based statute.   In a recent opinion construing the Minnesota Uniform Fraudulent Transfer Act (MUFTA), the Minnesota Supreme Court repudiated the presumptions of actual intent, insolvency, and lack of reasonably equivalent value that some courts have applied in the Ponzi-scheme context.[110]   With regard to value, the court held that MUFTA did not support a different value analysis based on the debtor's overall scheme or enterprise.   The court, citing statutory language such as "transfer" and "an asset," observed that the statute's focus is "on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme'" and, as a result, the statute dictates an "asset-by-asset" and "transfer-by-transfer" inquiry.[111]   The court also noted that if it were to presume that transfers from Ponzi-scheme operators were not for value, it would

---

[109] 767 F.3d at 441-43 ("Unlike interest payments, it is undisputed that the principal payments were payments of an antecedent debt, namely fraud claims that the investor-defendants have as victims of the Stanford Ponzi scheme.").

[110] *Finn*, 860 N.W.2d at 642.

[111] *Id.* at 647.

"effectively negate a transferee's good-faith defense to an actual-fraud claim."[112]  The court refused

to apply the statute in a way that would nullify a statutory affirmative defense whenever the debtor was

operating a Ponzi scheme, citing the absence of textual support for such a distinction.[113]  Instead, the

court held that "the determination of whether a debtor received reasonably equivalent value in

exchange for a transfer of its assets depends on the facts and circumstances of each case."[114]

## 4. Application to the Certified Question

In reviewing the summary judgment in Golf Channel's favor on its good-faith defense, the Fifth

Circuit did not apply a presumption of no value, per se; however, the manner in which it applied

TUFTA effectively does so.  Like the Minnesota Supreme Court, however, we discern nothing in

TUFTA's text suggesting the Legislature intended a different value standard to apply in the Ponzi-

scheme context.[115]  We therefore conduct the same "value" and "reasonably equivalent value" analysis

inquiry under TUFTA regardless of whether the debtor was operating a Ponzi scheme or a legitimate

enterprise.  We ask whether the debtor received value (i.e. whether the debtor received consideration

with objective, economic value, not merely consideration with some subjective, ephemeral, or

---

[112] *Id.* at 649; *see id.* at 652-53 (disagreeing that the purpose of MUFTA is "equality among a debtor's creditors").

[113] *Id.* at 648-49.

[114] *Id.* at 650.

[115] *See* TEX. BUS. & COM. CODE § 24.004(a) (defining value based on what "is given for a transfer" in the specific "exchange for the transfer"); *see also Finn*, 860 N.W.2d at 647 (noting the absence of the term "Ponzi scheme" in the MUFTA and the statute's focus "on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme'").

emotional value)[116] and whether the value exchanged was reasonably equivalent.[117]  If a debtor is operating a Ponzi scheme, a transferee may not have taken in good faith, but that inquiry is distinct from whether the exchange was for "reasonably equivalent value."

The value inquiry may turn on whether the consideration provided to the debtor was illegal, but the value of services or goods provided to a debtor does not hinge on whether a debtor utilizes services or goods to further an illegal scheme or to pursue a legitimate business endeavor.  Valuing consideration based on how the debtor decides to use it improperly applies a post hoc evaluation of the transaction.[118]

In this case, Golf Channel's media-advertising services had objective value and utility from a reasonable creditor's perspective at the time of the transaction, regardless of Stanford's financial solvency at the time.[119]  In exchange for its payments, Stanford received not merely speculative, emotional consideration, but accepted full performance of services with objective, economic value that were provided in the ordinary course of Golf Channel's business.[120]  Even if the media-advertising

---

[116] *See, e.g., Tavenner*, 257 F.3d at 408-09; *Zahra Spiritual Trust,* 910 F.2d at 249; *In re Bargfrede*, 117 F.3d at 1080; *In re Treadwell*, 699 F.2d at 1051; *In re Guerrera*, 225 B.R. at 36; *Mann*, 920 F. Supp. at 954; *McPherson Oil*, 643 So.2d at 596-97.

[117] *See In re Chomakos*, 69 F.3d at 770-72 (evaluating the *quid pro quo* and concluding values exchanged at a casino were reasonably equivalent despite the house advantage); *In re Guerrera*, 225 B.R. at 36 (explaining that "[i]t is not necessary that there be 'mathematical precision' or a 'penny-for-penny' exchange in order to establish reasonably equivalent value," but there cannot be a significant disparity between the values exchanged).

[118] *See, e.g., Hooper*, 104 S.W.3d at 86; *In re R.M.L.*, 92 F.3d at 153; *In re Chomakos*, 69 F.3d at 770; *In re Fairchild*, 6 F.3d at 1126; *In re Morris Commc'ns NC, Inc.*, 914 F.2d at 466; *see also* 5 Collier on Bankruptcy ¶ 548.03[5].

[119] *See Golf Channel I*, 780 F.3d at 646-47 (recognizing that such services "may have been quite valuable to the creditors of a legitimate business" and acknowledging the services did not "lack[] value in the abstract").

[120] *See, e.g., Tavenner*, 257 F.3d at 408-09; *Zahra Spiritual Trust,* 910 F.2d at 249; *In re Bargfrede*, 117 F.3d at 1080; *In re Treadwell*, 699 F.2d at 1051; *In re Guerrera*, 225 B.R. at 36; *Mann*, 920 F. Supp. at 954; *McPherson Oil*, 643 So.2d at 596-97.

services utterly failed in their ostensible purpose of attracting more business—and thus only served to deplete Stanford's assets—the inherent value of those services nonetheless existed at the time of the transaction. Moreover, as services were fully provided, each payment also had value under TUFTA by extinguishing claims against the estate for the value of those services.

For purposes of the "reasonably equivalent value" requirement in section 24.009(a), proof that an exchange occurred for market-value rates in an arm's-length transaction conclusively establishes that the value exchanged was "reasonably equivalent."[121] The district court determined that Golf Channel provided its services at fair market value in an arm's-length transaction, and the Receiver did not challenge that ruling on appeal.[122]

## III. Conclusion

Whether a debtor obtained reasonably equivalent value in a particular transaction is determined from a reasonable creditor's perspective at the time of the exchange, without regard to the subjective needs or perspectives of the debtor or transferee and without the wisdom hindsight often brings. Considering TUFTA's definitions of "value" and "reasonably equivalent value" as applied to the circumstances of this case, we conclude the reasonably equivalent value requirement in section 24.009(a) of TUFTA is satisfied when the transferee fully performed in an arm's-length transaction in the ordinary course of its business at market rates. Each of these components is fairly encompassed in the plain meaning of the terms "value" and "reasonably equivalent value," as specially and nonexhaustively defined, and each is rooted in the statute's express language.

---

[121] *See* TEX. BUS. & COM. CODE §§ 24.004(d), .009(a).

[122] *Golf Channel II*, 792 F.3d at 544.

Construing the relevant provisions and the statutory scheme as a whole, we hold TUFTA does not contain separate standards for assessing "value" and "reasonably equivalent value" based on whether the debtor was operating a Ponzi scheme. Transactions for consumable goods and services may deplete a debtor's leviable assets, but that factor alone does not render the exchange valueless. Value must be determined objectively at the time of the transfer and in relation to the individual exchange at hand rather than viewed in the context of the debtor's entire enterprise, viewed subjectively from the debtor's perspective, or based on a retrospective evaluation of the impact it had on the debtor's estate. We answer the certified question accordingly.

_____
Eva M. Guzman
Justice

**Opinion delivered:** April 1, 2016